substantially different effect. It seems to us entirely plain that, when the immigrant is inspected at the appropriate point, and when, because of the lack of the necessary papers, or for any other ordinary reason, he is not entitled to enter, the remedy is exclusion and not deportation.

If it were clear that the aliens had not intended to go to an inspection point, or to be inspected, but had only blundered into doing so, or had been apprehended in the effort to evade doing so, the question would be different; but that this alien had any purpose to escape inspection at Newport—beyond possibly a hasty plan abandoned while the opportunity for repentance was open—is not a reasonable conclusion upon this record; and we do not meet the question whether there was any evidence tending to support that conclusion because the Department did not make any finding to that effect, nor order deportation on that theory.

■ There is another reason why the warrant of deportation is bad,—at least as to the husband. In January, 1922, he entered from Canada, went back into Canada in July, and made the entry in question a few days later. Very clearly, upon this last entry, for which he was deported, he entered from foreign contiguous territory, and had entered that territory from the United States. The applicable provision is a part of section 156, title 8, USCA (section 20 of the act of 1917). It reads: " * * * If such aliens entered foreign contiguous territory from the United States and later entered the United States, or if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the country from which they entered the United States." Since, in cases like the present, "the country in which they resided prior to entering the country from which they entered the United States" was the United States, this last clause plainly can have no reference to such a case as this; it refers only to the second alternative found in the quoted language; so that, excluding the inapplicable language, the clause reads: "If such aliens entered foreign contiguous territory from the United States and later entered the United States * * * then to the country of which such aliens are subjects or citizens." Hence, in such a case, the Secretary has no option, but must deport the alien to the country of which he is a citizen. The initial option to select the "country whence he came" does not reach to this particular later clause. Conf. Gorcevich v. Zurbrick (C. C. A. 6) 48 F.(2d) 1054, April 7, 1931.

■ For the reasons set out in the Engel Case (C. C. A.) 51 F.(2d) 632, this day decided, this alien was not a citizen of Poland. Hence, there was no authority for deportation to that country.

We do not overlook the conduct of the aliens since their entry. They were released on bond pending departmental hearing, and also for trial on the indictment. They forfeited these bonds, disappeared, and have only recently been found, living under changed names. They should have made their contest immediately, but this later conduct has no bearing on the decisive question. Color is added by the fact that they were indicted and suffered bond forfeiture for an offense that had no legal existence.

The order discharging the writ of habeas corpus is reversed, and the case is remanded, with instructions to sustain the writ and discharge the aliens.

## REALTY ACCEPTANCE CORPORATION v. MONTGOMERY.

Circuit Court of Appeals, Third Circuit. January 15, 1930.

No. 4216.

See, also, 51 F.(2d) 642.

The opinion of Judge Morris was as follows:

By this action of covenant tried to the court without the intervention of a jury under R. S. § 649 (28 USCA § 773), Henry G. Montgomery, the plaintiff, seeks to recover from Realty Acceptance Corporation, the defendant, damages for the breach of its contract under seal, of September 23, 1924, employing plaintiff as its president and as the president of the Stuyvesant Corporation, all of whose capital stock was owned by the defendant, from the date of the contract to December 31, 1929, at a salary, from October 1, 1924, to December 31, 1929, at the rate of $25,000 a year, payable in equal monthly installments. The main breaches alleged are the removal of the plaintiff from the presidency of each corporation by the respective boards of directors in December 1926, and the nonpayment of any salary for the years 1927 to 1929, inclusive.

Defendant, a Delaware corporation, admits the contract and that, prior to its execution, it was authorized by its board of directors. It likewise admits the ouster and the nonpayment of salary for the three years. It makes no claim that plaintiff was incompetent. It asserts, however, in avoidance of liability, that its by-laws and those of the Stuyvesant Corporation, chartered under the laws of New York, both provided, at the time the contract was made, that the president "shall be chosen annually by the Board of Directors and shall hold his office until his successor shall have been duly chosen and qualified or * * * he * * * shall have been removed in the manner hereinafter provided," and " * * * may be removed, either with or without cause, by the vote of a majority of the whole Board of Directors; * * *" that plaintiff's removal by both companies was carried out in strict conformity with the by-laws; that the by-laws were valid and nullified or became by implication a part or condition of the contract; and that the contract was void for the further reason that it was against public policy.

Plaintiff does not deny that the by-laws were in existence at the time the contract was entered into; that they were valid; that he had knowledge thereof; or that the removal proceedings were had in strict conformity therewith. He takes the position, however, that, as there was no statutory in-

hibition against the employment of officers of Delaware or New York corporations for a fixed term, as the by-laws were amendable, article X, "by the affirmative vote of a majority of the whole Board of Directors, * * *" and as the making of the contract employing plaintiff for a fixed term was expressly authorized by more than a majority of defendant's board of directors, the contract was a pro tanto supersession of the by-laws, and must prevail over them.

Many cases deal with the relation of by-laws and contracts under varying circumstances. The Superior Court of New York ruled, in Martino v. Commerce Fire Ins. Co., 47 N. Y. Super. Ct. 520, that a contract of employment for a definite time prevailed over a by-law declaring that certain employees of the class to which plaintiff belonged should hold office during the pleasure of the board. The Appellate Division of the Supreme Court of that state decided in Reiss v. Usona Shirt Co., 174 App. Div. 181, 159 N. Y. S. 1031, 1033, that "the fact that the by-laws of the defendant, as known to the plaintiff, provided that the treasurer should be elected each year, and that he could be removed with or without cause by the directors, did not necessarily render such an agreement as was asserted by the plaintiff ultra vires the corporation."

Cuppy v. Stollwerck Bros., 216 N. Y. 591, 111 N. E. 249, 251, was an action to recover salary due, under a contract of employment, for one year, from which plaintiff was discharged at the end of four months under the authority of a by-law providing "the Board of Directors by a majority vote may * * * remove a director or officer and by like vote fill the vacancy. * * *" The court held that, "while the by-law empowered the board of directors to remove a director or officer, it did not authorize them to terminate a contract with one whom they had employed for a definite term. The fact that the plaintiff had been elected a director in no way alters the situation. His election as director was in pursuance of his contract of employment. It did not supersede the contract and render his contract which was for a definite term terminable at will. Douglass v. Merchants' Ins. Co., 118 N. Y. 484, 23 N. E. 806, 7 L. R. A. 822, upon which the respondent relies, is plainly distinguishable from this case. In that case one who acted as the secretary of the corporation at an annual salary was not employed for a definite term, and the decision in that case turned upon that fact. Indeed, in Judge Bradley's opinion in that case, it is pointed out that in cases where the employee had been employed under a special contract it has been held that the corporation loses its general power of removal."

In Nelson v. James Nelson & Sons, Limited, [1913] 2 K. B. 471, the facts were that plaintiff was elected managing director of the defendant for the term of four years. Before the expiration of that term, the directors revoked the appointment. The defendant contended that the article of association providing that the directors might revoke the appointment of any managing director appointed by them became by implication a part of the contract and authorized plaintiff's removal. The court denied this contention, saying: "Is there any prohibition in the articles against the directors appointing a managing director for a fixed term, provided he remains a director and performs his duty satisfactorily? If there is one it is to be extracted from the words 'and may revoke such appointment'. But I think sufficient meaning is given to these words if they are read 'and may exercise the power of revoking the appointment when the company or directors may legally do so'. * * * Article 85 (b) is, I believe, a very ordinary one in articles, and it would seem greatly to the prejudice of the company if, while they could employ a clerk for a fixed term, they could not offer so important an official as a managing director any security of tenure, but only an appointment at will or pleasure."

If the by-law may not be read into the contract of employment, it would seem to be of no importance that the by-law of the defendant provides for removal "either with or without cause. * * *"

The defendant, however, cites many cases to support its contention that, where a board of directors has power to remove officers at its pleasure, a contract for a definite period is ultra vires and void. But three of these decisions, Wright v. Warren Bros. Co. (C. C. A.) 204 F. 231, Long v. United Savings & Annuity Co., 76 W. Va. 31, 84 S. E. 1053, and Darrah v. Wheeling Ice & Storage Co., 50 W. Va. 417, 40 S. E. 373, were controlled by a statute of West Virginia (Code 1913, c. 53, § 53 [sec. 2885]), declaring "officers and agents so appointed shall hold their places during the pleasure of the board." Van Slyke v. Metropolitan Nat. Bank, 155 Minn. 319, 193 N. W. 470, was ruled by the National Banking Law, which expressly provides that any officer of a national bank may be removed at any time by the board of directors. Llewellyn v. Aberdeen Brewing Co., 65 Wash. 319, 118 P. 30, Ann. Cas. 1913B,

667, and Murray v. MacDougall & Southwick Co., 88 Wash. 358, 153 P. 317, were governed by a statute of the state of Washington empowering boards of directors to appoint officers, agents, and servants and to remove them at will. In Fowler v. Great So. Tel. Co., 104 La. 751, 29 So. 271, Hunter v. Sun Mutual Ins. Co., 26 La. Ann. 13, and Walker v. Maas, 132 A. 322, 4 N. J. Misc. R. 230, affirmed 104 N. J. Law, 341, 140 A. 286, there was no contract save that arising by inference from the election or appointment, and in the Louisiana cases the boards of directors, by whom the plaintiffs were elected, were without power to amend the by-laws made by the stockholders, providing for tenure of office during the pleasure of the board. In Auburn Academy v. Strong, 1 Hopk. Ch. (N. Y.) 278, the charter expressly empowered the trustees to appoint teachers and other officers and remove them at will. None of these cases holds, either directly or by analogy, that a by-law, subject to amendment by a majority of the board, nullifies a contract expressly authorized by the board.

The contrast, both in character and effect, between a self-imposed limitation of power that may be removed at will, as in the case at bar, and a limitation imposed upon the board by an authority to which the board is completely subordinate, as by a general statute laying down a state policy, or by the creative special act or certificate of incorporation, exemplified by all the foregoing cases that have to do with an express contract, is sharp and striking. The remainder of those cases, involving no special contract, were necessarily controlled, not by part, but by all, of the by-laws touching tenure of office. To read into a contract of employment for a definite period, expressly authorized by the board of directors, a by-law amendable by a majority of the board, and thus nullify the contract, would sacrifice substance and straightforwardness for form and procedure. Defendant's further contention that, if the contract be upheld at the expense of the by-law, boards of directors may by contract of employment for terms of years perpetuate their business policy and deprive succeeding boards of the power to afford relief, is not convincing. It sticks in the bark, for the evil possibilities suggested have their true foundation, not in the supremacy of contract over by-law, but in the futility of a limitation which rests solely upon a by-law amendable by a majority of the board. Were there doubt of the board's power to amend by necessary implication through solemnly authorized, inconsistent acts, the limitation would constitute no barrier to the commission of the suggested acts by a board so disposed, for the board could formally and expressly repeal the by-law containing the limitation and thereupon with all regularity authorize the contracts for terms of years.

I am of the opinion and find that the contract made by the defendant pursuant to the express authority of its board of directors, which had express power to amend at will the by-laws of the defendant, modified, in its legal effect, all inconsistent by-laws and prevails over them. See Machen on Corporations, § 728.

Nor was the contract one against public policy. It was not tainted with fraud. The restraint thereby placed upon the future freedom of action of defendant's board of directors cannot be said to have been in fact or principle injurious to the public interest. The term of office therein fixed was neither permanent, unlimited nor for life, but, in view of plaintiff's relation to defendant and his familiarity and grasp of its business, was for a reasonable period only. The contract was in conflict with no statute. In West v. Camden, 135 U. S. 507, 10 S. Ct. 838, 34 L. Ed. 254, the agreement was one made personally by a director and stockholder of a corporation that plaintiff should be permanently retained as vice president of that company. It was not an agreement by the corporation itself. Inasmuch as its breach might readily be presumed to result in personal liability for damages, the agreement was of a character to place defendant's personal interest in possible conflict with the best interests of the corporation and its stockholders, and, as plaintiff knowingly dealt with defendant with respect to a subject-matter touching his fiduciary relation to the stockholders, the contract was manifestly void as against public policy. Such a contract bears, I think, no more than a surface resemblance to the contract between the parties to this action.

By reason of the doctrine which attributes to the owners of a majority of the shares of a corporation a fiduciary relation towards the minority, see Fletcher Cyclopedia Corporations § 3973, the contract in Fabre v. O'Donohue, 185 App. Div. 779, 173 N. Y. S. 472, though made with plaintiff by a majority stockholder of Fabre Corporation, was nevertheless in principle not different from that in West v. Camden.

The remaining cases relied upon to establish a violation of public policy by the con-

tract here in suit require no separate consideration.

■ A further ground upon which the contract is not even open to the attacks hereinbefore considered is that, before the contract with defendant was made, plaintiff had entered into an agreement with the Stuyvesant Corporation to act as its president for the same period of time and for the same salary specified in defendant's agreement. As under the agreement with defendant plaintiff was employed as president of both companies and was to receive therefor from defendant the sum of $25,000 a year less any sums paid to plaintiff by Stuyvesant under his contract with it, the contract with defendant was in effect one by which defendant, in consideration of plaintiff's agreeing to act also as its president without additional compensation, agreed to retain plaintiff as Stuyvesant's president for the term of the contract, and to pay him therefor, in the event of Stuyvesant's default, the sum of $25,000 a year. The charter powers of the defendant were sufficiently broad for this purpose, and, as defendant was acting as a stockholder and as the sole stockholder of Stuyvesant, its act was unhampered by any by-law, fiduciary relation, or invalidating principle of the law of public policy. In my opinion the contract was valid, and I so find.

■ The defendant takes the position, however, that the contract, even if valid, was subject to the implied condition that the plaintiff should remain a duly qualified director, and shows that, pursuant to the authority of the by-laws of the two companies, he was removed as a director of each by their respective boards on December 31, 1926. His salary was paid to the end of 1926. But these facts are of no avail to the defendant. The contract was breached by the defendant while plaintiff was still a director of each company. Upon defendant's breach, plaintiff's cause of action was complete, and he was under no obligation longer to keep himself qualified for the presidency. 6 R. C. L. 1021, 7 A. & E. (2d Ed.) 151, note. Moreover, the contract contained an implied condition that the defendant would do nothing to defeat the rights of plaintiff under the contract, would do nothing to render his performance thereunder impossible. Yet defendant, the sole stockholder of the Stuyvesant Corporation, through its representatives, the directors of Stuyvesant, removed plaintiff's qualification for the presidency of that corporation by removing him from its board. That act constituted neither a defense to the prior breach nor a termination of defendant's liability under the contract. If of any legal effect, it was a further breach of the contract by the defendant. 6 R. C. L. 1020; Machen on Corporations, §§ 1078, 1080.

The contract was not only valid, it was breached by the defendant.

■ As the contract was valid and as it has been broken by the defendant, the plaintiff is entitled to a judgment for his damages. The measure of damages for the breach is the contract price unpaid, less the sums, if any, shown in mitigation of damages. American Trading Co. v. Steele, 274 F. 774 (C. C. A. 9); American China Development Co. v. Boyd (C. C.) 148 F. 258; Ransome Concrete Machinery Co. v. Moody, 282 F. 29 (C. C. A. 2).

■ The plaintiff diligently endeavored to find like employment, but could not. About September 1, 1927, he and Palmer & Co., a New York brokerage house, invested equal sums of money in a speculative account to be managed by plaintiff. Profits and losses were to be shared equally with the exception that plaintiff was to receive monthly, from profits before their distribution, the sum of $1,000. This arrangement continued for nine months, during which plaintiff received in that manner from profits an aggregate of $9,000 in excess of the distributive share of Palmer & Co. On June 1, 1928, plaintiff became one of the partners of Palmer & Co. As such he invested in the partnership business the same sum as each of the other partners. He, like they, also gave his time to the partnership. His profits for the five-month period ending December 1, 1928, were $31,743.51. Of this sum between $10,000 and $11,000 was paid. The remainder was paper profit represented by securities owned by the firm. Defendant contends that its prima facie damages should be lessened by the aggregate of the sums of $9,000 and $31,743.51, together with at least the one-fifth part of the latter sum as the estimated earnings of plaintiff for December, 1928. Plaintiff, however, takes the position that the salary to which he was entitled was a nonspeculative income requiring no capital investment, that since the breach he has been unable to obtain an income of like nature, and contends that damages for breach of a salary contract may not be mitigated by profits derived from plaintiff's speculation with his capital, regardless of whether such speculation has or has not been under his immediate personal supervision.

I think this contention sound. In re Moran, 299 F. 222 (C. C. A. 6); Sutherland on Damages (4th Ed.) p. 2565; Redfield v. Boston Piano & Music Co., 183 Iowa, 194, 165 N. W. 365; Williams v. Chicago Coal Co., 60 Ill. 149. It applies with particular force to the partnership profits made by risks of capital in which risks defendant did not share. Again, if in some ventures a part of the profits may be properly attributable to the personal service rendered and the remainder to the capital employed therein, it would be difficult, if not impossible, to make such allocation of plaintiff's partnership profits, and defendant has not attempted to do so. See Kyle v. Pou, 96 Ga. 166, 23 S. E. 114.

Though in the distribution of profits arising from the joint speculative account of plaintiff and Palmer & Co., the former was given a bookkeeping priority over the latter in the sum of $9,000, it is clear that the one-half part of that amount arose from plaintiff's speculation with his own capital, and that the setting aside for plaintiff from the gross profits was but a practical or bookkeeping way of enabling plaintiff to obtain compensation for his services in the management of the half interest of Palmer & Co., not a separation of profits arising from plaintiff's half interest into those attributable to his personal efforts and those due to his capital. Moreover, it does not appear that plaintiff's speculation could not have been carried on with equal success had the contract not been broken.

■ But that the other one-half part of the sum of $9,000, or $4,500, was not a profit flowing immediately from plaintiff's capital is equally clear. Plaintiff received it as compensation for his personal service in managing the half interest of Palmer & Co. in the joint speculative venture. Though it was not salary payable at all events, it was payment for personal services. I think it sufficiently related in character to plaintiff's salary under the contract to enable defendant to obtain the benefit thereof in mitigation of its damages.

■ On the day the contract was made, plaintiff wrote a letter to one of defendant's officers stating that he deemed it important that every reasonable effort should be made to minimize expenses during the first year, and that by reason thereof he was "prepared to leave with the corporation $10,000 of my first year's salary until such time as the common stockholders shall have received a dividend." As no dividend had been paid by defendant at the time of plaintiff's removal from office, the sum of $10,000 referred to in the letter had not been paid to plaintiff. It has not yet been paid. I find no ground upon which it may longer be withheld. If plaintiff's suggestion was made before the contract was entered into, it did not become a part of the contract, and is here without legal effect. If, however, it was made after the contract was concluded, it was but a voluntary suggestion, supported by no consideration, and of no binding force. Furthermore, had plaintiff's suggestion become a binding part of the contract, it would have been accompanied by the implied condition that plaintiff be allowed to act as defendant's president for the full term of the contract. Upon the breach of this condition by defendant, the $10,000 withheld would have become immediately due and payable.

Having charged myself with respect to the law as herein stated, I find in favor of the plaintiff and against the defendant, and assess plaintiff's damages at the sum of $80,500.

Charles F. Curley, of Wilmington, Del., and R. Randolph Hicks and Lauder W. Hodges, both of New York City, for appellant.

Robert H. Richards and Aaron Finger, both of Wilmington, Del. (Carl Ehlermann, Jr., and Thomas J. Crawford, both of New York City, of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

PER CURIAM. Affirmed on the findings made by Judge Morris and on his reasoning in entering the verdict.