**Vincent W. KOSUGA, Plaintiff-Appellee,**

v.

**Jack H. KELLY, Defendant-Appellant.**

**No. 12190.**

United States Court of Appeals
Seventh Circuit.

June 23, 1958.

Certiorari Granted Oct. 13, 1958.
See 79 S.Ct. 59.

Joseph W. Louisell, Detroit, Mich., Richard E. Gorman, Chicago, Ill., for appellant.

A. Bradley Eben, Lee A. Freeman, Chicago, Ill., for appellee.

Before MAJOR, SCHNACKENBERG and PARKINSON, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a summary judgment in favor of appel'ee (plaintiff) against appellant (defendant), entered October 11, 1957, in the amount of $37,-342.80, with interest and costs. The action was commenced September 11, 1956, and the judgment represents the balance due on a sale made December 17, 1955, by plaintiff to defendant, of fifty cars of onions.

If plaintiff was entitled to recover, there is no dispute as to the amount due as embodied in the judgment. The issues raised on this appeal require a statement of the salient facts which give rise thereto, as well as the essential

proceedings in the District Court. The case was tried and decided upon the pleadings, which included plaintiff's complaint, defendant's answer thereto, certain affirmative defenses asserted by defendant, as well as a counterclaim by which defendant sought to recover damages against plaintiff in the amount of $75,000. There was submitted in connection with the counterclaim an affidavit by each of the parties.

On December 17, 1955, when the contract in dispute was made, plaintiff and his associate, Sam Siegel (the latter not a party to this action), were owners of actual onions in Chicago and elsewhere. Defendant was a grower of onions. Both parties were engaged in the marketing of onions in Illinois and in commerce generally throughout the country. By the terms of the contract plaintiff agreed to sell and defendant agreed to purchase fifty cars of onions at $960 per car, plus storage charges, or a total of $48,000, plus storage charges. The terms of sale were: initial cash payment, $300 per car, or $15,000; second payment to be made by January 10, 1956, of $200 per car, or $10,000; the balance of $460 per car, plus storage to be computed at the time defendant ordered the cars withdrawn from storage, or a total of $28,-082. From time to time, defendant withdrew from storage thirteen cars of onions. The payments made by defendant consisted of $7,500 on December 22, 1955, and $5,000 on January 18, 1956, or a total payment of $12,500. No further payments were made as provided for in the agreement or for the thirteen cars of onions withdrawn by defendant from storage.

Onions, due to their perishable nature, can be kept in storage only for a reasonable period. On February 16, 1956, plaintiff sent a telegram to defendant, as follows:

"Storage onions you purchased from me on 12-17-55 now showing deterioration. You agreed to order out of Chicago storage and pay for these onions during January and early February 1956. Present condition of onions require immediate action. Demand payment by 2-20-56 and will surrender negotiables upon receipt of payment."

On the same date, plaintiff wrote defendant, which in general was confirmatory of the telegram. On February 20, 1956, defendant responded by telegram, as follows:

"Our agreement does not provide that onions be withdrawn from storage in substantial quantity by early February. We intend to abide by the original agreement and we expect you to do likewise."

Defendant, on March 9, 1956, notified plaintiff that he would withdraw no further onions from storage and that he would make no further payments. The reasons for such refusal will be subsequently noted under defendant's affirmative defenses.

The facts so far stated are conceded by defendant. In connection therewith it is pertinent to note that defendant makes no contention, either by allegation or otherwise, but that the price which he agreed to pay for the onions was the fair and reasonable cash market price. For reasons asserted in the affirmative defenses, defendant contends that payment of the balance due on the contract cannot be judicially enforced. Such defenses are predicated upon an alleged factual situation from which it is argued that there was incorporated in and made a part of the sale agreement certain conditions in violation of anti-trust laws, both Federal and State (Illinois), as well as the Commodity Exchange Act, 7 U.S. C.A. § 1 et seq. These affirmative defenses were, on motion of plaintiff, stricken by the court. We need cite no authority for the well established rule that all facts well pleaded must be taken as true. This is so even though plaintiff by answer has in large part denied defendant's allegations.

We find it difficult, as is often the case under similar circumstances, to separate facts well pleaded from those of a conclusory and argumentative nature. It appears, however, that the essential al-

legation of fact is that referred to as the non-delivery provision asserted to have been made at the same time and in connection with the sale of the onions. It appears from the briefs that each of the parties recognizes this provision as furnishing the principal bone of contention. Relative thereto, it is stated in defendant's brief that it was agreed by the parties that "the plaintiff and Sam Siegel would not deliver any onions on the futures market for the balance of the 1955-1956 trading season" (referring to onions owned and controlled by plaintiff and Siegel other than those involved in the sale to defendant), and that the defendant and other onion growers "agreed to purchase the 287 carloads of onions [this includes the 50 cars purchased by defendant] and to desist from selling them upon the futures market for the balance of the trading season in consideration of the promise of the plaintiff and Sam Siegel not to deliver any of the onions owned, held or controlled by them on the futures market for the balance of the 1955-1956 trading season."

It is alleged as a legal conclusion, "The avowed and express object of said agreement was to fix the price of onions and limit the amount of onions sold in the State of Illinois, to fix and manipulate the market price of onions and to stabilize said price and, if possible, to increase their price, said onions being a part of interstate commerce, and to create a false and fictitious market condition." In connection with this non-delivery provision, it is pertinent to note that each of the parties remained free to merchandise onions in normal commercial trade channels.

The District Court in a memorandum opinion reasoned that the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, could not be asserted as a defense to the action for the unpaid balance of the purchase price, principally upon three grounds: (a) the so-called condition of non-delivery was not an inherent part of the sale and, thus, assuming the reciprocal agreement not to sell onions on the futures market during the balance

of the 1955-1956 trading season was illegal, the obligation of defendant to pay was supported by other lawful consideration, to-wit, plaintiff's promise to sell the fifty carloads of onions at an agreed price; (b) the remedies provided by the Sherman Anti-Trust Act are exclusive and do not afford defendant the affirmative defense asserted, and (c) the so-called condition of non-delivery was not an illegal restraint of trade condemned by the Sherman Act.

In support of his position, plaintiff places great reliance upon Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679, while defendant places equal reliance upon Continental Wall Paper Company v. Louis Voight & Sons Company, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486. Connolly involved an action to recover the price of sewer pipe sold and delivered to defendant. The defense asserted that plaintiff was part of a monopolistic conspiracy and combine for the express purpose of limiting production of sewer pipe and increasing the market price thereof, that the sale involved was at prices fixed by the monopoly in violation of the Sherman Act and, therefore, unenforceable. The Court, in holding the defense not available, stated (184 U.S. at page 551, 22 S.Ct. at page 436):

"The buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination which might be restrained or suppressed in the mode prescribed by the act of Congress; for Congress did not declare that a combination illegally formed under the act of 1890 should not, in the conduct of its business, become the owner of property which it might sell to whomsoever wished to buy it. So that there is no necessary legal connection here between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies, and firms. The contracts under which the pipe in question was sold were,

as already said, collateral to the arrangement for the combination referred to, and this is not an action to enforce the terms of such arrangement. That combination may have been illegal, and yet the sale to the defendants was valid."

Continental involved an action to recover the alleged balance on an account for merchandise sold and actually delivered. Defendant as one of its defenses asserted that it, along with plaintiff and other corporations, was a party to an agreement, combination and conspiracy in restraint of trade in violation of the Sherman Anti-Trust Act and that the contract of sale was an inherent part of the illegal scheme. The Court sustained the validity of the defense, with a dissenting opinion by four members. The Court at great length distinguished the Connolly case, and discussed the situation before it as a basis for a holding contrary to that of Connolly, concluding such discussion as follows (212 U.S. at page 260, 29 S.Ct. at page 291):

"In short, the defense in the Connolly Case was that the plaintiff corporation, although owning the pipe in question and having authority to sell and pass title to the property, was precluded by reason *alone* of its illegal character from having a judgment against the purchaser. We held that that defense could not be sustained either upon the principles of the common law or under the anti-trust act of Congress."

In Continental, both plaintiff and defendant were admittedly members of a combination and conspiracy in violation of the Anti-Trust Act. The Court emphasizes the particularly vicious nature of the violations in which the parties were engaged. As descriptive thereof the Court quotes from the Court of Appeals as follows (212 U.S. at page 256, 29 S.Ct. at page 289):

" 'The conspiring mills were situated in many states. The consumers [of wall paper] embraced the whole citizenship of the United States.

The jobbers and wholesalers, who were to be coerced into contracts to buy their entire demands from the Continental Wall Paper Company or be driven out of business, were in every state. Before the combination each of the combining companies was engaged in both state and interstate commerce. The freedom of each, with respect to prices and terms, was restrained by the agreement, and interstate commerce directly affected thereby, as well as by the enhancement of prices which resulted. A more complete monopoly in an article of universal use has probably never been brought about. It may be that the wit of man may yet devise a more complete scheme to accomplish the stifling of competition. But none of the shifts resorted to for suppressing freedom of commerce and securing undue prices, shown by the reported cases, is half so complete in its details. None of the schemes with which this may be compared is more certain in results, more widespread in its operation, and more evil in its purposes.' "

After all is said and done, the essential distinction between Connolly and Continental is that in the former plaintiff was engaged in a rather innocuous form of violation of the antit-trust laws to which defendant, as buyer, was not a party, while in Continental plaintiff was engaged in a vicious form of anti-trust violation and defendant, as buyer, was a party to plaintiff's unlawful activities. It is also important that in Connolly recovery was sought for the fair and reasonable price of goods sold, while in Continental recovery was sought for the price which resulted from and was determined by the terms of the conspiracy in which the parties were participants. In the former, defendant was not permitted to plead plaintiff's anti-trust violation as a defense, while in the latter the same defense asserted by defendant was sustained. Thus, these two cases, as defendant would have them applied, lead to the incongruous result that a Court

will lend its aid to enforce payment by a buyer innocent of wrongdoing but will deny its aid to enforce payment by a buyer who is a wrongdoer, that is, a party to and a part of a combination engaged in anti-trust violations. A reading of the cases subsequent to Continental demonstrates that the Courts generally, while recognizing its rationale, have in the main limited the case to its particular vicious facts. Its application has been denied under a variety of circumstances.

In D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, the Court rejected the defense of alleged violation of the Anti-Trust Acts. In doing so, we think it enlarged the doctrine of Connolly and at the same time limited that of Continental. The action was brought to recover the price of glucose sold to defendant. In defense it was claimed that plaintiff was part of a monopoly which had advanced the price of glucose and set up a profit-sharing plan under which purchasers were required to buy all of their requirements fom the combine, thus restraining competition in violation of the Sherman Act. The contract of sale permitted the purchaser to share in a profit-sharing plan of the seller, on condition that the purchaser use the seller's glucose exclusively. It was specifically provided in the contract for sale, "Goods herein sold are for your own consumption and not for resale." Thus, defendant (buyer) was by agreement with plaintiff (seller) restricted in its right to purchase as well as in the use of the purchased product.

The Court affirmed the action of the lower Court in striking the answer as being no defense, affirmed judgment for the price of the goods sold, and stated (236 U.S. at page 172, 35 S.Ct. at page 400):

> " * * * the sale and the obligations which arose from it depended upon a distinct contract, with reciprocal considerations moving between the parties,—the receipt of the goods on the one hand, and

the payment of the price on the other. And this is but a form of stating the elementary proposition that courts may not refuse to enforce an otherwise legal contract because of some indirect benefit to a wrongdoer which would be afforded from doing so, or some remote aid to the accomplishment of a wrong which might possibly result,— doctrines of such universal acceptance that no citation of authority is needed to demonstrate their existence, especially in view of the express ruling in Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S. Ct. 431, 46 L.Ed. 679, applying them to the identical general question here involved."

The Court continued (236 U.S. at page 172, 35 S.Ct. at page 400):

> "The case therefore reduces itself to the question whether the contract of sale was inherently illegal so as to bring it within the also elementary rule that courts will not exert their powers to enforce illegal contracts or to compel wrongdoing. The only suggestion as to the intrinsic illegality of the sale results from the averments of the answer as to the offer of a percentage of profits upon the condition of dealing exclusively with the Refining Company for the following year, and the clause to the effect that the goods were bought by the Manufacturing Company for its own use, and not for resale. But we can see no ground whatever for holding that the contract of sale was illegal because of these conditions."

In Wilder, the Continental case was relied upon in support of the defense, as it is here. Relative thereto, the Court stated (236 U.S. at page 177, 35 S.Ct. at page 402):

> "But is is apparent on the face of the opinion in the Continental Wall Paper case that it affords no ground for the extreme and contradictory conclusion thus deduced from it, since the ruling in that case

was based not upon any supposed right to import into a legal and valid contract elements of wrong which there was no right to consider, but was rested exclusively upon elements of illegality inhering in the particular contract of sale in that case, which elements of illegality may be thus summarized: (a) the relations of the contracting parties to the goods sold, (b) the want of real ownership in the seller, (c) the peculiar obligations which were imposed upon the buyer, and (d) the fact that to allow the nominal seller to enforce the payment of the price would have been in and of itself directly to sanction and give effect to a violation of the anti-trust act inhering in the sale."

■ It seems to us that the reasoning of the Court in Wilder, and particularly the appraisement which it made of its former opinion in Continental, is highly pertinent to the instant situation. Here, as in Wilder, there was a contract of sale. Plaintiff was to receive and defendant was to pay the fair market value of the onions. Assuming that which we think doubtful, that is, that the non-delivery agreement was illegal, there is no more reason here than there was in Wilder for importing such elements of wrong into an otherwise legal and valid contract. More than that, the instant action is not to enforce the non-delivery provision but to enforce defendant's promise to pay. Such enforcement, as stated in Wilder (236 U.S. at page 177, 35 S.Ct. at page 402), will not "sanction and give effect to a violation of the anti-trust act inhering in the sale." This principle has been reaffirmed in Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219. In that case it was stated (330 U.S. at page 755, 67 S. Ct.) that the Court would entertain a defense that the contract is illegal only where the suit "has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought * * *." See also

United States Hoffman Machinery Corp. v. Valeteria Cleaners, Inc., D.C., 143 F. Supp. 797, 799.

■ Defendant challenges and seeks to distinguish the cases which we have discussed by arguing that the non-delivery provision of the contract was an integral part thereof, in other words, that because of such provision the entire contract is tainted with illegality and no part of it is enforceable. We do not agree with the premise upon which this contention rests. The non-delivery provision, while a part of the same contract, is separable from and not inherent in defendant's promise to pay the reasonable market price for the onions. A case in point is Cincinnati, Portsmouth, Big Sandy & Pomeroy Packet Co. v. Bay, 200 U.S. 179, 26 S. Ct. 208, 50 L.Ed. 428. In that case, the Court separated the legal from the illegal covenant and enforced the lawful promise made for adequate consideration even though an unlawful promise was made at the same time for the same consideration. In reference to one facet of the unlawful portion of the contract which appears to have been a price fixing condition, the Court stated (200 U.S. at page 185, 26 S.Ct. at page 210):

"It only remains to say a word as to the agreement to maintain rates. This is a covenant by the purchaser, the plaintiff in error. It is not the covenant sued upon. It is not declared to enter into the consideration of the sale. If necessary, we should be astute to avoid allowing a party to escape from his just and substantially legal undertaking on such a ground."

■ Defendant also relies upon the Commodity Exchange Act (7 U.S.C.A. Pars. 5, 13). It is contended that the contract in suit is in violation of that Act on the basis that the non-delivery provision created a "false and fictitious" market condition in onions by manipulation and increase in price. The contention with reference to this Act parallels that relative to the Federal Anti-Trust

Act. Our discussion in connection with that Act is equally pertinent. In our judgment, and we so hold, the affirmative defenses predicated upon the Federal Anti-Trust Act and the Commodity Exchange Act are not available to defendant and such defenses were properly stricken by the District Court.

■■ Defendant as a further affirmative defense also relies upon the Anti-Trust Act of Illinois (Chap. 38, Sec. 569 et seq., Smith-Hurd Illinois Ann. Stat.). Section 573 declares that any contract or agreement in violation thereof shall be absolutely void. Section 574 provides that a purchaser of a commodity contrary to the provisions of the Act may plead the Act as a defense to any suit for the recovery of such price. Thus, the Illinois Act, unlike the Federal Act, specifically provides that a violation of the Act may be pleaded as a defense. The Illinois Act as the substantive law of the State is applicable only to intrastate commerce. Defendant apparently so recognizes and argues that such commerce was involved inasmuch as the contract of sale was made and was to be performed in the State of Illinois. Defendant makes this argument in spite of the frequent allegations in his pleadings that "said onions which were the subject of said agreement and contract were a part of interstate commerce." In 15 C.J.S. Commerce § 133(b), it is stated that "state anti-trust laws do not apply to transactions involving interstate commerce * * *." It is hardly open to doubt but that the transaction in issue involved interstate commerce. It is, therefore, our view that the Illinois Act is without application.

Furthermore, the Illinois provision which makes a violation available as a defense has been narrowly construed by this Court. Chicago Wall Paper Mills v. General Paper Co., 7 Cir., 147 F. 491. We held that the defense could not be raised in an action for the recovery of the purchase price of goods where it was not sought to enforce the illegal condition. We reasoned that the illegal covenant should, where possible, be separated

from the valid promise to pay for the goods sold. As already shown, the Federal Courts have permitted recovery based upon the same reasoning.

■ We may add that a reading of the Illinois cases is convincing that the transaction in dispute is not violative of the Illinois Act, even though its applicability be assumed. In Match Corp. of America v. Acme Match Corp., 285 Ill.App. 197, 204, 1 N.E.2d 867, 870, the Court stated:

"All contracts which on their face place a restriction upon the acts of the other party to the contract are necessarily a restraint to a certain extent. If the effect does not destroy competition and is merely intended to increase the business of the parties to the contract, and is only incidental to and found necessary in order to protect the parties' interest as set forth in the contract and does not tend to promote a monopoly, such provisions do not make the contract illegal and void."

See also Moody & Waters Co. v. Case-Moody Pie Corp., 354 Ill. 82, 187 N.E. 813, and Southern Fire Brick & Clay Co. v. Garden City Sand Co., 223 Ill. 616, 79 N.E. 313, 9 L.R.A.,N.S., 446.

Lastly, defendant contends that its counterclaim was improperly dismissed In this claim it was alleged that plaintiff violated the non-delivery provision of the contract by delivering onions on the futures market during the balance of the 1955-1956 trading season and that plaintiff disrupted the cash market of onions by selling and delivering unusual quantities below the prevailing price. The counterclaim does not allege when this alleged breach on the part of plaintiff took place. Plaintiff in support of his denial of a breach submitted an affidavit which accounted for the fifty carloads contracted for by defendant. The affidavit shows that on or about February 7, 1956, thirteen carloads were withdrawn from storage by defendant; March 19, 1956, fourteen carloads were sold by plaintiff to Campbell Soup Company, and

at a later date eight carloads were sold for cash to other onion brokers, leaving in storage fifteen carloads which had deteriorated to the extent that they could not be sold and were abandoned. Neither the manner of disposal of these onions by plaintiff nor the time is disputed by defendant.

■■ The short and fatal answer to defendant's contention is that he first breached the contract. As heretofore shown, defendant agreed to an initial cash payment of $15,000, and a second payment of $10,000 by January 10, 1956. However, the total payment made by him was $12,500. Thus, defendant was in continuous default and breach of the contract from and after January 10, 1956. It is a well established principle that a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party. Realty Acceptance Corp. v. Montgomery, 3 Cir., 51 F.2d 636, 640; Raybestos-Manhattan, Inc., v. Asbestos Textile Co., 1 Cir., 79 F.2d 634, 637; Sonken-Galamba Corp. v. Butler Iron & Steel Co., 8 Cir., 119 F.2d 233, 286. Moreover, it must be remembered that on March 9, 1956, defendant notified plaintiff that he would withdraw no further onions from storage and that he would make no further payments. At that time plaintiff was charged with the obligation of disposing of the onions at the best price available in mitigation of damages sustained by reason of defendant's breach. There is no allegation in the pleadings or affidavits that plaintiff acted improperly in the discharge of this obligation. In fact, as noted, plaintiff's affidavit, which is not denied, demonstrates that the onions (other than the thirteen cars for which delivery was accepted by defendant) were disposed of by plaintiff subsequent to the time when defendant refused to accept further delivery, and that defendant was given credit for the amount so realized. In our view, defendant's counterclaim failed to state an action upon which he was entitled to relief, and the claim, together with the answer thereto and affidavits submitted by the parties, demonstrates that there was no material issue of fact raised or involved.

In our judgment and we so hold, the District Court committed no error in striking the affirmative defenses pleaded by defendant or in dismissing his counterclaim. The judgment appealed from is

Affirmed.