**Julius MULLINS et al., Plaintiffs,**

v.

**KAISER STEEL CORPORATION, Defendant.**

Civ. A. No. 78–0650.

United States District Court, District of Columbia.

March 9, 1979.

Stephen J. Pollak, Washington, D. C., for plaintiffs.

A. Douglas Melamed, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

The difficult questions before the Court concern the legality and enforceability of a clause of the National Bituminous Coal Wage Agreement of 1974 (hereinafter the "1974 Agreement") [1] providing for a royalty payment to the United Mine Workers of

1. The National Bituminous Coal Wage Agreement of 1974 is a collective bargaining agreement executed by the United Mine Workers of America International Union, various multi-employer bargaining entities, the largest of which is the Bituminous Coal Operators Association (hereinafter "BCOA"), and certain individual coal operators. The 1974 Agreement was in force and effect between December 6, 1974 and December 6, 1977.

America Health and Retirement Funds (hereinafter the "Funds") on all bituminous coal procured or acquired by a signatory employer for use or for sale on which contributions to the Funds had not been made (hereinafter the "purchase-of-coal clause").[2] The purchase-of-coal clause is only one component of the 1974 Agreement which establishes the terms and conditions of employment for Kaiser Steel Corporation (hereinafter "Kaiser") coal mining employees. The 1974 Agreement also requires Kaiser to make payments to the Funds based on the hours worked and coal produced by its employees.[3] Kaiser, a member of the BCOA and therefore a signatory to the 1974 Agreement, made contributions on the coal produced by its own 400 UMWA employees but failed to make any contributions pursuant to the purchase-of-coal clause. Kaiser never acknowledged any coal purchases voluntarily despite the fact that the terms of the 1974 Agreement were apparently based on the parties' understanding that the Trustees of the Funds would rely upon signatory operators to furnish information concerning the amount of coal produced and purchased (Complaint, Exhibit A, p. 29). The signatories reported under separate entries the tonnage of coal purchased and produced and also calculated the amount of contributions payable to the Funds on "remittance advice forms" supplied by the Trustees.

Kaiser also failed to inform the Trustees voluntarily of its decision to withhold Fund contributions required by the purchase-of-coal clause. Had Kaiser elected to test the purchase-of-coal clause during the term of the 1974 Agreement, a contract provision calling for renegotiation in the event of a successful challenge could have been invoked by the Union in order to remedy the resulting deficiency in pension benefit contributions from signatories.[4] The Trustees contend that Kaiser effectively foreclosed the intended application of the renegotiation provision by failing to disclose coal purchases and deprived covered employees of part of their bargained-for wages which the Trustees now seek to recover.

On April 11, 1978, the Trustees of the Funds brought this suit under Section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185 and Section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 seeking to recover from Kaiser contributions alleged to be due and owing to the Funds pursuant to the purchase-of-coal clause.[5]

Plaintiffs have moved for summary judgment arguing that the principles announced in *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) require judicial intervention and enforcement of payments pursuant to the purchase-of-coal provisions regardless of Kaiser's claims of illegality.

2. Article XX(d)(1)(v) provides in part:
. . . during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made . . .
Complaint, Exhibit A, p. 28.

3. The plaintiff Trustees have not claimed that Kaiser is delinquent in making contributions to the Funds based on the number of "hours worked" and coal produced by Kaiser employees covered by the 1974 Agreement.

4. Article XX(d)(1)(v)(v) provides in part:
The parties hereto mutually agree that, if at any time during the term of this Agreement a

court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in the paragraph just preceding [purchase-of-coal clause] is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option and upon demand by the Union without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.
Complaint, Exhibit A, p. 28.

5. Memoranda submitted by the parties discuss recovery by the Trustees on a restitution theory but the complaint seeks recovery on the contract only.

In opposition to the Trustees' motion and in support of its own motion for summary judgment, Kaiser contends that its agreement with the United Mine Workers union to contribute to the Funds pursuant to the coal purchase royalty clause is illegal, unenforceable and void as a "hot cargo" provision under Section 8(e) of the Labor-Management Relations Act, 29 U.S.C. § 158(e); that is, an implied agreement to cease doing business with non-signatory employees and signatories which are delinquent in Fund contributions. Kaiser also urges that the *Kelly v. Kosuga* decision permits the interposition of the defense of antitrust illegality under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 because the contract provision relied upon by the Trustees is itself unlawful.[6]

Finally, the Trustees argue that the Court is without jurisdiction to hear a Section 8(e) defense and failing this, that several disputed issues of material fact preclude summary judgment in favor of Kaiser.

## Antitrust Defense

The decision in *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) restated the position of the United States Supreme Court regarding recognition of a defense of antitrust illegality to an action brought on a contract. In *Kelly,* as in prior decisions, the Court attempted to accommodate the competing interests involved: enforcement of a contract provision which may in itself be unlawful or in furtherance of illegal ends and thereby frustrating public policy, or denial of recovery which may result in unjust enrichment at the plaintiff's expense or otherwise impose a penalty unrelated to the character of plaintiff's illegal acts and thereby give defendant a windfall.

The contract sued upon in *Kelly*[7] provided for the sale of fifty carloads of onions at market price to an onion grower and included an agreement by the vendor not to deliver onions on the futures market in order to maintain artificially high prices. This contract was one aspect of a larger price maintenance scheme in which other onion growers purchased additional onions from the vendor and then agreed among themselves not to market the onions. The vendee accepted delivery of thirteen carloads but only made partial payment before refusing delivery of the remaining thirty-seven carloads. After repudiation by the vendee, the vendor sold the rapidly deteriorating onions at a reduced price in mitigation of damages and brought suit on the contract for the unpaid purchase price. The vendee argued that the sale was made pursuant to and as an indivisible part of an agreement restraining trade in violation of the Sherman Act. Plaintiff's motion to strike this affirmative defense was granted by the trial court which rendered summary judgment for the plaintiff.

The Supreme Court upheld a judgment for the contract price in favor of the vendor and stated:

> As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court. This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold.

358 U.S. at 518, 79 S.Ct. at 431. The Court noted its extreme reluctance to supplement the express remedies provided by the antitrust laws with an additional remedy of

---

**6.** The antitrust defense has been briefed by the parties only with reference to the decision in *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) and the availability of an antitrust defense to an action to recover pension contributions on an expired contract. Motion of Kaiser Steel Corporation for Summary Judgment at 2 n.2. Several other defenses raised by way of answer have not been argued by Kaiser. The Court finds the defenses of

standing and failure to join an indispensable party to be without merit. *See Lewis v. Quality Coal Corp.,* 243 F.2d 769, 772–73 (7th Cir. 1957); *Paul v. Lindgren,* 375 F.Supp. 843, 849 (N.D.Ill.1974).

**7.** The opinion of the Seventh Circuit Court of Appeals in *Kosuga v. Kelly,* published at 257 F.2d 48, amplifies the factual background giving rise to the litigation.

contract avoidance and also restated the limits of the defense of antitrust illegality:

> Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the [Sherman] Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, "of preventing people from getting other people's property for nothing when they purport to be buying it." . . . Supplying a sanction for the violation of the Act, not in terms provided and capricious in its operation, is avoided by treating the defense as so confined (citations omitted).

358 U.S. at 520–21, 79 S.Ct. at 432.

■ The general rule emerging from *Kelly* is that a contract should be enforced whether or not it fosters illegal ends, unless the alleged illegality is of such a character that enforcement of the contract would "make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." 358 U.S. at 520, 79 S.Ct. at 432. The extreme difficulty confronting Kaiser in attempting to demonstrate that the purchase-of-coal clause falls within the narrow exception noted in *Kelly* is underscored by the fact that the Supreme Court has sustained the defense of antitrust illegality on only one occasion. The unique factors present in *Continental Wall Paper Co. v. Louis Voight & Sons Company,* 212 U.S. 227, 256, 29 S.Ct. 280, 290, 53 L.Ed. 486 (1909) which led the Court to condemn a monopolization and price-fixing scheme characterized as "certain in results . . widespread in its operation, and . . . evil in its purposes" and to sustain an antitrust defense to a contract action are not present in this case. *See D. R. Wilder*

*Manufacturing Company v. Corn Products Refining Company,* 236 U.S. 165, 177, 35 S.Ct. 398, 59 L.Ed. 520 (1915).

In similar decisions preceding *Kelly v. Kosuga,* the Supreme Court sought to reconcile conflicting policies underlying antitrust law and contract principles by adhering to a difficult formula distinguishing between enforceable "collateral" agreements not illegal in themselves and "inherently" illegal agreements. *Compare Continental Wall Paper Co., supra,* with *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902). The *Kelly* decision signals abandonment of this troublesome test and in its place the Supreme Court has invited attention to the nature of the remedy sought as the touchstone for determining whether or not an alleged antitrust illegality should counsel a court to refuse assistance to a party presenting a contractual claim.[8] *See Kelly v. Kosuga,* 358 U.S. at 521, 79 S.Ct. 429.

■ The Trustees are seeking to recover one component of agreed compensation pursuant to the terms of a contract which has expired. The amounts claimed are based on purchases actually made. The contract is at an end—decisions to purchase or not to purchase have been made and acted upon. Whether or not an express or implied agreement not to make *future* purchases of coal, like the nondelivery agreement referred to in *Kelly* at 521, 79 S.Ct. 429, would warrant a different result, the Court concludes that requiring payments pursuant to the purchase-of-coal clause cannot be said to be enforcing a restraint of trade within the meaning of *Kelly v. Kosuga.*[9]

**8.** In so holding the Court relied on *Corbin on Contracts* which explains:

> There are cases in which the making of a bargain may be prohibited, even though the performances agreed upon are all perfectly lawful . . . .. [For example], problems arise with respect to a bargain in unreasonable restraint of trade, the bargain being illegal although the performances promised are not; also with respect to the transaction of business without a license. It will be found that the determination of divisibility may de-

pend as much upon the remedy that is sought (specific performance, injunction, damages, restitution, etc.) as upon the nature and extent of the illegality. 6A *Corbin on Contracts* § 1520 at 755–56 (1962).

**9.** The Court notes that Kaiser has failed to seek affirmative relief by availing itself of the powerful treble damage remedy provided for claimants who can demonstrate injury resulting from a restraint of trade such as that alleged here by way of defense.

*The "Hot Cargo" Defense*

The Court disagrees with the arguments advanced by Kaiser concerning the proper application of Section 8(e) and concludes that Section 8(e) is not a bar to recovery by the Trustees under the facts and circumstances of this case.

■ In deciding whether or not to allow the interposition of a Section 8(e) defense, the Court is guided by *San Diego Building Trades Council et al. v. Garmon et al.,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Thus, when an activity is arguably subject to Section 8 of the National Labor Relations Act, federal courts must defer to the exclusive competence of the NLRB. This is true, where as here, an aggrieved party declines to bring allegedly illegal Section 8 activity to the attention of the NLRB or, as noted in *Garmon,* where the NLRB failed to determine the status of the allegedly unlawful conduct. *Id.* at 245–46, 79 S.Ct. 773.

■ Congress enacted Section 8(e) in order to plug a "loophole" in the law of "secondary boycotts" recognized by the Supreme Court in *Local 1976, United Brotherhood of Carpenters v. NLRB (Sand Door),* 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) in its interpretation of Section 8(b)(4)(B) of the Taft-Hartley Act of 1947, 29 U.S.C. § 158(b)(4)(B). *See National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The inclusion of "hot cargo" prohibitions within Section 8(e) along with the express introductory phrase "it shall be an unfair labor practice" suffice to create a presumption that, in enacting Section 8(e), Congress intended simply to expand the list of unfair labor practices subject to exclusive NLRB jurisdiction.

■ The addition of the "unenforceable and void" language without more cannot change the character of the "hot cargo" legislation so as to create a separate federal remedy not available in the enforcement of other unfair labor practices. As the Trustees point out in their Reply Memorandum at 11–12, the purpose of the "unenforceable and void" language "was to ensure that the 8(e) prohibitions would reach all contracts even those in effect at the time of the enactment of the legislation."

■ Examination of the relevant legislative history supports rather than detracts from this Court's tentative construction of Section 8(e) and its proper application to the case at bar. Kaiser's reference to Senator Goldwater's remarks on the impact of Section 8(e) fully comports with the Court's view that the Trustees are not seeking damages but are attempting to recover agreed upon compensation which is in part measured by the amount of coal purchased by Kaiser. *See* Kaiser Memorandum at 18, n.22 *quoting* II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1857 (hereinafter "II Legislative History"). In addition, remarks made by Senator Kennedy, one of the sponsors of the bill, indicate his belief that Section 8(e) was intended simply to create a new unfair labor practice enforceable by the NLRB:

> Tomorrow, after thinking about it overnight, we might decide whether we should consider giving priority to the handling of unfair practices arriving under this provision. We should consider whether we ought to give priority to any unfair labor practice charges which might come to the attention of the Board in this particular category.

II Legislative History at 1163.

Cases cited by Kaiser do not undercut the Court's conclusion that it cannot entertain a Section 8(e) defense. Decisions such as *Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962) only hold that "[t]he authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301." *Id.* at 197, 83 S.Ct. at 269. Thus, federal courts are not precluded from deciding contract claims under the express grant of jurisdiction under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, simply because the breach of contract might also be an unfair labor practice.

In *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Court was not confronted with an agreement claimed to constitute an unfair labor practice involving complex questions of intent and effect. Rather the Court was presented a task for which it is ideally suited; that is, balancing the labor and antitrust policy while determining whether the construction industry proviso of Section 8(e) removed certain activity from the reach of the antitrust laws. The Court agrees with plaintiffs' observation that the "collateral" labor law issue involved in *Connell* is very different from the question Kaiser is asking this Court to resolve, a question well beyond " 'the conventional experience of judges' " which raises issues " 'within the special competence' " of the NLRB. *International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers v. Hardeman*, 401 U.S. 233, 238–39, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971).[10] *See Huge et al. v. Long's Hauling Co., Inc.*, 580 F.2d 457 (3d Cir. 1978).

The Court concludes that the record in this case does not raise any genuine issue of material fact and that the Trustees are entitled to summary judgment. An order reflecting the judgment of the Court and awarding appropriate relief, including the award of reasonable attorneys' fees, has been entered previously.

---

**10.** The memoranda submitted by the parties demonstrate that the issues raised by the attempt to enforce the purchase-of-coal clause are of central importance to the national labor policy and that the NLRB has consistently exercised its jurisdiction to resolve Section 8(e) issues raised throughout the evolution of the purchase-of-coal clause.