The **ASSOCIATED PRESS**, Plaintiff-Appellee,

v.

**TAFT–INGALLS CORPORATION**, formerly known as **The Cincinnati Times-Star Company**, Defendant-Appellant.

No. 15514.

United States Court of Appeals
Sixth Circuit.

Jan. 18, 1965.

Robert T. Keeler, Cincinnati, Ohio (Taft, Stettinius & Hollister, Robert T. Keeler, Robert G. Stachler, Cincinnati, Ohio, on the brief), for appellant.

Timothy S. Hogan, Cincinnati, Ohio (Cohen, Baron, Druffel & Hogan, Timothy S. Hogan, Cincinnati, Ohio, on the brief), for appellee.

Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.

PHILLIPS, Circuit Judge.

Three principal daily newspapers were published in Cincinnati, Ohio, prior to 1958: (1) An afternoon newspaper owned by appellant, known as The Cincinnati Times-Star, (2) The Cincinnati Post, also an afternoon paper, which was a part of the Scripps-Howard system; and (3) The Cincinnati Enquirer, a morning paper. As of July 19, 1958, publication of The Times-Star was discontinued and the paper was sold to the owner of its afternoon competitor, the E. W. Scripps Company, and the combined afternoon newspaper thereafter has been published under the name of The Cincinnati Post and Times-Star.

Appellee, the Associated Press, filed a breach of contract action against appellant for failure to pay assessments for the AP's news services for two years following discontinuance of publication. Jurisdiction is based upon diversity of citizenship. The district judge, sitting without a jury, rendered judgment

against appellant in favor of the Associated Press for $158,703.43, plus interest and costs, and dismissed a counterclaim. This appeal is from the judgment of the district court.[1]

A motion to dismiss the appeal was denied. Associated Press v. Taft-Ingalls Corporation, 323 F.2d 114 (C.A.6).

The Associated Press is a non-profit corporation organized in 1900 under the Membership Corporation Law of New York. It is engaged in gathering, obtaining and procuring any and all kinds of news, which it furnishes to its members for publication. The membership of AP consists of owners of newspapers and radio and television stations. There are two types of membership, regular and associate. The costs of its operations are prorated among the members under a formula of assessments adopted by the Board of Directors, acting under the authority of its By-laws.

At the time of the incorporation of AP in 1900, a representative of Times-Star applied for and was admitted to AP membership. Times-Star subscribed to and used AP wire services as a regular member continuously from that time until discontinuance of publication 58 years later.

### 1) The Contract Between The Parties

This controversy arose out of a contract between the parties, entered into August 4, 1948, which provided that: "[I]t shall continue * * * until terminated by the Member upon two years' notice, in writing, by registered mail * * * "; and further provided that: "Upon the sale or transfer of the business of the Member to which this agreement relates, the Member shall cause the Member's successor to agree in writing to fulfill the terms and conditions of

---

1. Contemporaneously with the sale of its newspaper, the name of appellant, an Ohio Corporation, was changed from The Cincinnati Times-Star Company to Taft-Ingalls Corporation. Appellee sometimes will be referred to in this opinion as "The Associated Press" or "AP," the Cincinnati Times-Star as "Times-Star," the

Cincinnati Post and Times-Star as "Post and Times-Star," the E. W. Scripps Company as "Scripps," the United Press as "UP," the International News Service as "INS," and United Press International as "UPI." UP and INS were merged into UPI in 1957.

this agreement during the term thereof and to apply for membership in The Associated Press in the same class as the Member."

When appellant stopped publication of Times-Star on July 19, 1958, AP was informed by telegram of the sale to Scripps and the following directions were given: "Accordingly please cancel all services * * * immediately under our contract with you." No back assessments were owing by appellant when publication of Times-Star ceased. The weekly assessment of appellant was paid through June 26, 1958, one week after publication of Times-Star had been discontinued. Thereafter no services were furnished by AP to appellant and no further payments were made. The only assessments at issue in this case are those for the two-year period after termination of publication and after delivery of the AP news wire services to appellant had been discontinued.

The district judge held that appellant was liable to AP for weekly assessments for its wire news service for the two succeeding years because appellant had not notified AP two years in advance of its termination of the news services,[2] and since Scripps did not become a member of AP and did not subscribe to the AP wire services previously furnished to appellant. The judgment is based upon the assessment of $1583.81 per week which was in effect on the date of termination of publication, less a saving to AP of $43 per week representing the cost of the wire and mechanical facilities, or net damages to AP of $1540.81 per week for 103 weeks.

### 2) The AP Wire Services

Appellant alleges and appellee admits that AP has an established practice of requiring a member newspaper in the metropolitan cities of this geographical area of the United States to receive and pay for all three of its basic news wire services to such city, and, in addition, in Cincinnati, required appellant to receive and pay for the Kentucky wire as a part of the basic service. This practice, appellant contends, constitutes an unlawful tying arrangement in violation of Section 1 of the Sherman Act,[3] and renders the contract void and unenforceable.

This AP policy and practice of "tying" four wire services together in a single "package" and requiring that appellant take and pay for four wire services in order to receive any one of them is the principal issue on this appeal.

The wire [4] services provided by AP under its contract with appellant were described in a letter from AP's Chief of Bureau at Columbus, Ohio, to the editor of Post and Times-Star dated August 1, 1958, as follows:

"Pursuant to our telephone conversation I am listing below the basic news service that was delivered to the Cincinnati Times-Star and is proposed to be delivered to the Post and Times-Star;

" 'A' *trunk circuit*. This is a general news wire carrying stories of top general interest.

---

2. In June 1954, appellant transferred ownership and publication of Times-Star to its wholly-owned subsidiary, The Cincinnati Publishing Company, which in turn sold the newspaper to Scripps four years later. Appellant's contract with AP was never assigned to its subsidiary. AP had no cause to deal with the subsidiary because appellant continued to act as a member. The District Court held that there was no novation within the requirements of Ohio law. This intervening period of ownership and operation by appellant's subsidiary is not considered to have any significance for the purposes of this appeal.

3. 15 U.S.C. § 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

4. The use of the word "wire" grows out of the earlier method of transmitting news over telegraph by Morse Code. The term is explained in the record as follows: "It is not a physical wire; it is an electronic channel. In many cases there is no wire, it is a wireless beam used by the telephone company or Western Union."

" 'D' *trunk circuit.* This circuit carries financial stories, commodity quotations and other business news.

"*Ohio Big Cities Circuit.* This circuit carries Ohio, regional and general news copy.

"*Kentucky regional.* Two circuits, one operating in TTS style, one in all-caps, deliver Kentucky state news.

"*Wirephotos.* Full service on this facility consists of the delivery of glossyprints from day and night operation.

"The assessment for the basic minimum news service outlined above is $1,558.05 weekly.

"The assessment for Wirephoto service is $279.80 weekly.

"In addition, the Times-Star received various optional services * * * "

A stipulation of facts entered into between the parties describes the basic AP wire services furnished to Times-Star as follows:

"The leased wire news service referred to in the above contract between the AP and the Times-Star consisted of general news and stories of general interest carried and transmitted over the "A" trunk circuit; the financial stories, commodity quotations and business news carried and transmitted over the "D" trunk circuit; and the Ohio regional news and general news copy carried and transmitted over the Ohio Big Cities circuit."

3) *Times-Star's Efforts to Reduce Costs*

Faced with an operating deficit, appellant undertook, beginning in 1957, a stringent cost reduction program in an effort to make it possible for Times-Star to survive. A survey was made of AP, UP and INS wire costs. A substantial item of expenditure was the AP assessment, which at that time was $1452.25 per week. Appellant determined that it did not need all of AP's basic news services. On August 14, 1957, appellant wrote a letter to AP, the text of which is printed in the margin.[5] A meeting was held in Cincinnati between representatives of AP and appellant on September 10, 1957, for the purpose of discussing a reduction in the basic news services. During this meeting appellant requested AP to furnish to it only the Ohio Big Cities circuit, which was considered the "most necessary" to appellant of the AP news services. This request would have eliminated the "A," "D" and Kentucky wires, and, if granted, would have effected a substantial reduction in appellant's operating costs. AP declined this request, stating that it was the practice of AP to require all members at Ohio trunk points to receive and pay for the "A," "D" and the Ohio Big Cities news wires, and that appellant must continue to pay the unit price for all these wires in order to receive any of them.

Previously appellant had requested information of AP as to how much was being paid for the Kentucky State wire. AP replied that:

"The Kentucky state service, subject of your October 25 inquiry, is part of the basic Associated Press service in Cincinnati, and provision of this service is an integral part of the basic service covered by your Agreement.

"There is a payment of $10.00 weekly toward maintenance of The Associated Press bureau in Lexing-

5. "We are undergoing a stringent cost reduction program at the TIMES-STAR and in surveying our wire service costs, we feel that the Basic News Service charge of $1,452.25 weekly is excessive.

"Our files will show that we have greatly reduced the amount of AP copy that we are carrying and as we have no Sunday edition, many AP features are of no use to us.

"An analysis of our rates shows that a figure somewhere in the neighborhood of $700 per week would come much closer to our use of the service.

"We will anticipate discussion on the subject before taking any other action."

ton, but there is no separate charge for the Kentucky state wire other than that included in the contract figure. This wire is not one of the various optional services not covered by the contract figure."

Its request having been turned down, appellant continued to receive and pay for all of said basic services until continued operating losses of Times-Star compelled discontinuance of publication on July 19, 1958.

Immediately thereafter Scripps proposed to subscribe to the AP "A" wire trunk circuit service and to become an associate member of AP for that purpose. AP declined to provide "A" wire service to Scripps unless Scripps also would agree to subscribe to the "D" wire and the Ohio Big Cities wire (also known as the "S" wire). This policy of treating these three wire services as one inseparable "economic package" has been applied consistently by AP to metropolitan newspapers in this area of the United States, consisting generally of the area north of the Mason-Dixon line and east of Kansas City, Missouri.[6]

In addition to asserting that this "tying arrangement" was a violation of the Sherman Act and a valid defense against AP's breach of contract action, appellant filed a counterclaim seeking $157,366.92 in treble damages against AP under the Sherman Act.

The district judge ruled that:

"The Sherman Act's interpretation has broadened considerably since the early tie sales cases which involved products tied to patent products. It is entirely possible that the Plaintiff's method of dispensing its news is in violation of the Sherman Act." But that: "Defendant has failed to provide this Court with sufficient facts upon which it may be concluded that there is a natural division in the cost of gathering news transmitted over the A, D, and State trunks. Without such a complete division, it is unnecessary and futile to explore the other elements of the alleged tying agreement."

The district court ruled that on the "paucity of facts," appellant cannot prevail either in asserting violation of the Sherman Act as a defense or under its counterclaim.

### 4) *Application of Sherman Act to AP*

■ It is clear that the Associated Press is subject to the provisions of the Sherman Act. As said by the Supreme Court in Associated Press v. United States, 326 U.S. 1, 7, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013:

"Member publishers of AP are engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything

---

6. AP has approximately 250,000 miles of leased news wire connecting most of the cities of the United States. This network of wires is leased by AP from the American Telephone and Telegraph Company and the Western Union Telegraph Company. In each AP office and in the office of each AP member where there are AP employees, there is one transmitting machine and one receiving machine attached to each circuit for the purpose of transmitting and receiving news on the circuit. Each member that uses this kind of equipment leases it from AP and pays AP for it. There are approximately 43 metropolitan areas throughout the country including Cincinnati, which are considered by AP to be "trunk point cities." These cities make up the major newspaper markets of the United States.

News originating in the United States is not sent to a single point, but is transmitted to AP members directly from the AP news bureau in the area in which the news originates. News from abroad is sent to AP offices in New York, from which it is transmitted throughout the United States. Leased wire services furnished to newspapers in smaller cities are transmitted over a single circuit, and to members in large cities over multiple circuits. As held by the District Court: "These multiple circuits, commonly called trunks, have come into existence because, under present technology, it is impossible to transmit all state, national and international news on one circuit."

else people need or want. See International News Service v. Associated Press, 248 U.S. 215, 229, 230 [39 S. Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293]. All are alike covered by the Sherman Act. The fact that the publisher handles news while others handle food does not, as we shall later point out, afford the publisher a peculiar constitutional sanctuary in which he can with impunity violate laws regulating his business practices."

■ It follows that if an illegal tying agreement is established by the evidence in this case, AP cannot escape the consequences on the theory that it is a mutual and cooperative association, distributes news only among its own members, pays no dividends, defrays its expenses through assessments, and does not "sell" news for a "price."

### 5) The "Tying" Arrangement

■■ The burden of proving that a contract is illegal is upon the party asserting it, which in this case is appellant. Palmer v. Chamberlin, 191 F.2d 532, 27 A.L.R.2d 416 (C.A.5); Illinois Surety Co. v. O'Brien, 223 F. 933 (C.C.A.6).

■■ It is undisputed that AP refused to furnish the Ohio Big Cities news circuit separately to appellant and required that appellant, against its own will and business judgment, continue to subscribe and pay for three services which it did not want, the "A," "D" and Kentucky wires, in order to receive the Ohio regional wire which appellant considered to be essential to its operations. Do the facts concerning this practice, which has been adhered to consistently by AP ever since establishment of the "D" wire in 1935, coupled with evidence concerning other essential elements of antitrust violation as hereinafter discussed, constitute a violation of Section 1 of the Sherman Act under the record in this case? If so, it is axiomatic that the contract between appellant and AP is "illegal" under the express terms of the statute. 15 U.S.C. § 1. A party to an illegal bargain cannot "recover damages for breach thereof." Restatement, Contracts, § 598; also § 514, special note. As said by the Supreme Court in United States v. Loew's Inc., 371 U.S. 38, 51, 83 S.Ct. 97, 105, 9 L.Ed.2d 11: "[T]he thrust of the antitrust laws cannot be avoided merely by claiming that otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the antitrust laws could be nullified. Contractual obligations cannot thus supersede statutory imperatives."

■ A tying arrangement has been defined as follows:

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product * * *." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 518, 2 L.Ed.2d 545.

Such arrangements are frowned upon and in some situations are declared unlawful *per se* because, as the Supreme Court has pointed out: "[T]ying arrangements serve hardly any purpose beyond the suppression of competition." Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518; Black v. Magnolia Liquor Co., 355 U.S. 24, 25, 78 S.Ct. 106, 2 L.Ed.2d 5; Standard Oil Co. of California v. United States, 337 U.S. 293, 305, 69 S.Ct. 1051, 93 L.Ed. 1371.

### 6) Separability

■ AP insists that it is engaged in distributing only one product, news from all parts of the world—international, national and local—and that the news transmitted by it is so intermingled that it is inseparable; that although news is transmitted to metropolitan newspapers over several circuits, these circuits are interdependent and form an integrated whole in the delivery of the leased wire news service; that the means by which news is transmitted does not determine the character of the news; and that the leased AP wire news service is a single product and not several separate and dis-

tinct products. AP relies upon the proposition that the essential element of an illegal tying agreement is an obligation imposed by one party upon another to take or purchase an unwanted product as a condition to obtaining a desired product, and that a tying agreement cannot exist within the meaning of the antitrust laws unless the sale of one product is conditioned upon the purchase of another separate and distinct product.

The question of separability is the first issue to be determined on this appeal. In disposing of this issue, however, it it not necessary to pass upon the separability of all four of the wire services furnished by AP to appellant. We are not required to decide whether the "A" wire is separable from the "D" wire, since Times-Star concluded that it did not want or need either of these services. Neither are we required to decide whether the Kentucky State wire was separable from the other services. The only issue of separability is whether the Ohio Big Cities wire was a separable product as distinguished from the other three wires; that is, was the Ohio Big Cities wire, the "tying" product, separable from the "A," "D" and Kentucky wires, the "tied" product.

■ Even if it be concluded that the Ohio Big Cities wire was used principally to transmit news of regional and local interest and that the other wire services were used principally to transmit news of different classifications, we are faced with the problem of whether the Ohio wire represents a separate product, or whether it and the other three services involve but *one* product, that is, news. Though separability of products is an element in every tying case, it has rarely posed a problematical issue before the courts. See United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559, n. 25 (E.D.Pa.), aff'd, per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200.

In adjudicating the question here involved, we begin by looking to those few cases which bear on separability, although each of them involves distinguishable facts.

In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, the Supreme Court held that a New Orleans publishing company did not violate the antitrust laws in requiring that advertising space be purchased in both the morning and afternoon newspapers. One of the reasons for the Court's holding was its difficulty in delineating two distinct products. The Court said:

"The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market. Here, however, two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists (in fact, since space in neither the Times-Picayune nor the States can be bought alone, one may be viewed as 'tying' as the other); no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same." 345 U.S. at 614, 73 S.Ct. at 883.

AP relies heavily upon Times-Picayune in support of the decision of the district court. It should be noted, however, that the rationale of Times-Picayune as to "market dominance" was weakened by the subsequent decision in Northern Pacific Railroad Co. v. United States, supra, 356 U.S. 1, 78 S.Ct. 514. Furthermore, in contrast to Times-Picayune on the tying issue, there was a dominant "tying" product in the instant case as applied to appellant, to wit, the Ohio Big Cities news service. This was the "tying" product which appellant considered essential to its operations, while not desiring to continue its subscription to the "tied" products, the "A," "D" and Kentucky State wires. It should be added that, as to the force of Times-Picayune as a

precedent, one court recently said: "Furthermore, the Times-Picayune case has been limited to the exact set of facts before the court * * *." American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 221 F.Supp. 848, 850 (S.D. N.Y.).

In United States v. Loew's Inc., supra, 371 U.S. 38, 83 S.Ct. 97, the defendants distributed motion picture films to television stations by the method known as block booking; that is, TV stations were required to purchase a package of films to get any at all. In this way film producers were able to tie bad films to the desirable ones. It was argued, *inter alia,* that "movies" were a single product and that there was no separability of two distinct products. The Court answered this contention by saying: "The district judge found that each copyrighted film block booked by appellants for television use 'was in itself a unique product'; that feature films 'varied in theme, in artistic performance, in stars, in audience appeal, etc.,' and were not fungible. * * *" 371 U.S. at 48, 83 S.Ct. at 104.

A decision in which the facts have some analogy to the instant case is American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., supra, 221 F.Supp. 848 (S.D.N.Y.). There Kemper Insurance desired to sponsor an ABC television program on 95 affiliated stations. These stations were geographically situated where Kemper's advertising would be most effective. ABC refused the offer unless Kemper would also sponsor the program on 35 additional stations. ABC argued that only one product was there involved, to wit, sponsorship of TV programs, and that there was no separability of two or more distinct products. The court disagreed, saying that 35 undesirable stations are not the same as 95 desirable stations. 221 F.Supp. at 850.

A leading case in this area, for its discussion of separability of products, is United States v. Jerrold Electronics Corp., supra, 187 F.Supp. 545 (E.D.Pa.),

aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, involving master television antenna systems for dealers, apartment houses and communities normally unable to receive television signals. Jerrold would not sell its equipment unless the customer would also purchase a service contract which would assure Jerrold supervision over the installation and maintenance; and also would not sell its various items of equipment designed for community antenna systems separately, but would only sell them as components of a complete system. In holding that this practice violated the Sherman Act, the court first passed upon the question of separability. This issue was stated as follows:

> "The difficult question raised by the defendants is whether this should be treated as a case of tying the sale of one product to the sale of another product or merely as the sale of a single product. It is apparent that, as a general rule, a manufacturer cannot be forced to deal in the minimum product that could be sold or is usually sold. On the other hand, it is equally clear that one cannot circumvent the anti-trust laws simply by claiming that he is selling a single product." 187 F.Supp. at 559.

The court then proceeded to state four criteria of separability which are discussed hereinafter at page 764 of this opinion.

In Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 (C.A.1), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194, relied on by the district court in the instant case, the defendant manufactured silos and an unloader which could be installed at the base of a silo. For six years defendant made it a practice to sell its unloader separate from its silo. A number of customers complained that the unloader would not operate successfully on silos of another make. To meet this problem, defendant adopted a policy of not selling unloaders unless they were to be installed in pres-

762

ently-purchased or already-owned silos of its own manufacture. The question was whether this was a tying arrangement which violated the anti-trust laws.

The court held that in light of the customer complaints the defendant was justified in adopting its new policy; and that the requirement that the unloaders be installed only in defendant's silos was reasonable under the circumstances.

Thus it will be seen that the court's decision does not really turn on the question of inseparability. In fact, by basing its decision on "sound business reasons," the court would seem to presuppose that there are two separate products.

The Dehydrating Process Co. case obviously would be more nearly analogous on its facts to the instant case if the manufacturer had required the purchase of an unloader as a prerequisite to the purchase of a silo.

 One of the evils inherent in any tying arrangement is that it forces the buyer to give up his independent judgment as to whether, or where, to purchase the tied product. United States v. Loew's Inc., supra, 371 U.S. 38, 45, 83 S.Ct. 97; Northern Pacific Railway Co. v. United States, supra, 356 U.S. 1, 6, 78 S.Ct. 514.

Turning again to the instant case, there can be no doubt that the arrangement here involved forced the publishers of Times-Star to give up their independent judgment as to which of the wire services was required for its operations. At the time AP refused to furnish appellant the Ohio Big Cities wire to the exclusion of the "A," "D" and Kentucky wires, Times-Star was a subscriber to various other wire services. It began using certain UP services in July 1955, and at that time already was an AP and INS subscriber. It was receiving the UP national wire, state wire and sports wire.

Certain of these services were duplications. Appellant's executives, in an effort to combat an operating deficit, concluded that the AP "A," "D" and Kentucky services no longer were required. The amount of AP copy published in Times-Star had been greatly reduced.

The former assistant to the publisher of Times-Star testified that "we had good coverage in Northern Kentucky" and "had quite a staff over there," and that the AP Kentucky wire was no longer needed. He further said that if the AP "D" wire had been dropped as requested, he would have subscribed to the UPI financial wire. On the other hand he described the AP Ohio Big Cities wire as "essential" to the publication of Times-Star. The former Times-Star telegraph editor testified that the AP Ohio Big Cities wire "was far superior to the United Press state service." The former publisher of Times-Star described the Ohio Big Cities wire as "the major service of The Associated Press" for Times-Star purposes, and said that "we needed that service very badly."

In this situation, who better than appellant was in a position to choose which wire services it needed and wanted and to exercise independent judgment to that end?

Yet the record clearly establishes that AP required appellant to continue to subscribe and pay for three wires which appellant did not want and need, in order to receive a fourth wire which it considered to be essential, and thereby forced appellant to give up its independent judgment as to whether to subscribe to the three unwanted and unneeded services. This is one of the situations which is "an object of anti-trust concern." United States v. Loew's Inc., supra, 371 U.S. 38, 44–45, 83 S.Ct. 97, 102.

Lending support to the view that the Ohio Big Cities wire is separable from its other wires is AP's treatment of the Kentucky wire. AP had refused to give Times-Star a separate quotation for this wire, taking the position that it was a part of the basic service for Cincinnati. Earlier in this opinion we have quoted AP's statement in a letter to appellant that the Kentucky wire was "part of the basic Associated Press Service in Cincinnati, and provision for this service is an integral part of the basic service covered by your agreement." When Scripps bought the paper in 1958, and proposed

to subscribe to the "A" wire, AP agreed to eliminate the Kentucky wire from its basic service, thereby reducing the assessment by $240.60 per week. It had refused to quote a separate assessment to appellant for the Ohio Big Cities wire, yet it was able to quote a separate charge to Scripps for the Kentucky wire. Thus the cost of the Kentucky wire was separated for Scripps. The parallel conclusion as to the separability of the Ohio Big Cities wire seems obvious to us.

By this action AP demonstrated, contrary to the findings of the district court, that the cost of a state wire can be separated from the cost of its other wire services. On the question of the separability of charges we see no difference between the Kentucky State wire and the Ohio Big Cities regional wire.

Further, the AP sports wire, which formerly was a part of the basic wire service, was separated and a specific charge was made therefor. AP permitted Times-Star to cancel this separate service in 1956. Other services, such as the wirephoto service, were provided by AP on an optional basis, and for specific separate charges.

The evidence further establishes that the Ohio Big Cities wire was operated at different hours from the other services. The Ohio wire was controlled from Columbus, Ohio, while the other wires were controlled elsewhere. The Ohio wire was physically separable in that it connected different cities and could be added to or taken from the service provided to any newspaper. The "A" wire connected 193 larger cities; the "D" wire connected 56 cities; the Ohio Big Cities wire connected ten cities in Ohio and West Virginia, two of which did not receive the "D" wire and one of which did not receive either the "A" wire or "D" wire. Separate receiving equipment was required for each wire.

In support of its contention that its news services are not separate and distinct products, AP introduced evidence that the "D" wire sometimes is used for the transmission of general news in addition to business, financial and market news, particularly if the "A" wire at the moment cannot accommodate such news; that general news of all kinds in addition to regional news is transmitted over the Ohio Big Cities wire; that news from abroad on occasion has been carried on all of the wires in question; and that if there were four or five major stories coming in at one time, it might be impossible to put them all on one wire, and the excess would be "spilled over" on other wires. Although news may be "spilled over" from the other wires to the Ohio Big Cities wire when the AP circuits are overloaded, this fact was well known to appellant. It was the prerogative of appellant to decide whether it chose to subscribe only to the Ohio Big Cities service, and thereby take the chance of receiving incomplete "spilled over" news of international, national and financial events in addition to the regional and local news carried over the Ohio Big Cities wire.

With reference to the practice of "spilling over" news, the record shows that news from the "A" wire sometimes is "spilled over" on the "D" wire or on the Ohio Big Cities wire, and that "A" and "D" wire news may be "spilled over" on the Ohio Big Cities wire, but we find no evidence that the Ohio regional news which Times-Star considered so essential to its operation was "spilled over" on the "A," "D" or Kentucky wires. Quite obviously it would be rare indeed for news of local and regional interest carried over the Ohio wire to ten cities in Ohio and West Virginia to be "spilled over" on the "A" wire connecting 193 cities, the "D" wire connecting 56 cities, or the Kentucky state wire carrying news of primary interest to readers in the Kentucky area.

It is clear that Times-Star found it necessary to continue its subscription to the Ohio Big Cities wire because this was the only wire service providing satisfactory coverage of news of regional and local interest. AP contends that the transmission of regional and local news did not make the Ohio wire separable,

because there are duplications of news carried on this and other wires. The evidence shows, however, that when there is a duplication, it is because the duplicated news item is a matter of interest to newspaper readers in the Ohio area. For example, if the President of the United States spoke at Cleveland or Columbus, Ohio, the story would be transmitted over the "A" wire and also over the Ohio Big Cities wire. A financial story of nationwide interest originating in Ohio might be carried over both the "D" wire and the Ohio Big Cities wire. If a major accident occurred in Ohio, resulting in a substantial number of deaths, it would be carried over the "A" wire, and perhaps also over the Ohio Big Cities circuit. A minor accident in Ohio resulting in one death ordinarily would be reported only over the Ohio Big Cities circuit.

In United States v. Jerrold Electronics Corporation, supra, the court laid down four criteria of separability as follows:

"There are several facts presented in this record which tend to show that a community television antenna system cannot properly be characterized as a single product. Others who entered the community antenna field offered all of the equipment necessary for a complete system, but none of them sold their gear exclusively as a single package as did Jerrold. The record also establishes that the number of pieces in each system varied considerably so that hardly any two versions of the alleged product were the same. Furthermore, the customer was charged for each item of equipment and not a lump sum for the total system. Finally, while Jerrold had cable and antennas to sell which were manufactured by other concerns, it only required that the electronic equipment in the system be bought from it." 187 F.Supp. at 559.

Transposing these four criteria of separability to the facts of the instant case, we find:

1. AP's competitor, UPI, offered everything necessary for a complete news service, but did not charge for its basic wires in a single package as did AP;

2. The number of news dispatches of AP and other news services vary considerably and are used by newspapers as space and interest warrant. Hardly any two versions are the same;

3. UPI charges separately for its news wires, as does AP for the Kentucky wire (at least in its proposal to Scripps), the sports wire, and various supplemental wires;

4. Finally, AP offered certain wires on an optional basis, but required appellant to subscribe for the "A" wire, "D" wire and Kentucky wire on a "package" basis in order to receive the Ohio Big Cities wire.

It is true that no tying arrangement is spelled out expressly in the contract between the parties upon which AP based this action, or in the AP By-Laws. The result is accomplished by the By-Law provision that the nature and extent of the news service to be furnished a member shall be determined by the Board of Directors.[7]

---

7. Article VII, Section 1 and 2 of the By-Laws, entitled "Use of News," provides as follows:

"Sec. 1. The nature and extent of the news service to be furnished to a member shall be determined by the Board of Directors, upon the member's admission, and the initial assessment shall be fixed at the same time and by the same authority. Both the nature and extent of such news service and the assessment may be changed from time to time by the Board of Directors, provided that the Board of Directors shall not omit the news service to any member except for cause as provided in these By-Laws.

"Sec. 2. Each member shall take the news service of the Corporation as specified in Section 1 of this article and use it in whole or in part as provided in his or its contract with the Corporation and in conformity with the By-Laws thereof." Paragraph 6 of the contract between the parties provides:

"In the event that any of the terms and conditions of this agreement shall be or become contrary to or inconsistent with the By-Laws of the Associated Press, the By-Laws shall control."

A tying arrangement or condition "need not be expressly embodied in written contracts. Such arrangements may be deduced from a course of conduct." Osborn v. Sinclair Refining Co., 286 F.2d 832, 837 (C.A.4), cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255. The tying arrangements found unlawful in United States v. Loew's Inc., supra, and United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, were not spelled out in contracts. As said in McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 338 (C.A.4):

> "Admittedly, the written agreement between the parties contains no provision requiring the franchisees to deal only in goods supplied by Western Auto. This, of course, merely means that the contract is not unlawful on its face. The writing could be supplemented by an extrinsic course of conduct from which the illegal condition or understanding might be found."

The district court laid strong emphasis upon its finding that the record in this case contains insufficient evidence to establish a natural division in the costs of gathering news transmitted over the "A," "D" and Ohio Big Cities wires and the amounts of the costs to AP of providing these respective services. It expressly held that appellant "has failed to provide this court with sufficient facts upon which it may be concluded that there is a natural division in the costs of gathering news transmitted over the A, D and state trunks." A finding of fact by the district court is binding upon this court unless "clearly erroneous." Rule 52(a), Fed.R.Civ.P. It is our obligation as an appellate court to overrule the "clearly erroneous" findings of the district court in an anti-trust case, as in other civil actions tried by a district judge without a jury. Osborn v. Sinclair Refining Co., supra; A. C. Becken Co. v. Gemex Corp., 272 F.2d 1 (C.A.7), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L. Ed.2d 876; Ball v. Paramount Pictures, 169 F.2d 317 (C.A.3), cert. denied, 339 U.S. 911, 70 S.Ct. 568, 94 L.Ed. 1337; 6 Toulmin's Anti-Trust Laws, § 21.24 (1951). As said in United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L.Ed. 746: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

We agree with the district court that such evidence would be indispensable to support the counterclaim filed by appellant. The only evidence in the record on this question was offered by an accountant employed by appellant for the purpose of allocating the basic AP assessment among the "A" wire, the "D" wire and the Ohio Big Cities wire. We agree with the district court that this evidence was too speculative to support the counterclaim filed by appellant for the recovery of treble damages against AP. The record shows that AP did not keep its records in such a manner as to establish an accurate division of costs as between its three basic wire services. We are of the opinion, however, that the determination of the existence of a tying arrangement which is illegal under the Sherman Act, thus constituting a complete defense to AP's action for breach of contract, is not controlled by the way AP has kept its cost records.

AP was able to arrive at a specific charge of $240.60 per week for its Kentucky wire when it decided to offer this concession to Scripps. The AP wirephoto service was priced separately at $278.80 per week. Separate charges also were established for the sports wire and other optional services, some of which formerly were a part of the basic service. We have no doubt that a division could be made by AP for a separate charge for its Ohio Big Cities wire. Once it is determined that separability exists, it is not important that AP might experience inconvenience in making a breakdown of charges.

The basic error of the district court was in holding that, in order to establish its affirmative anti-trust defense, it was obligatory upon appellant to prove that

there was a natural division of costs in gathering news transmitted over the Ohio Big Cities wire and the other wires in question. We do not construe the decisions to impose such a burden upon a defendant asserting an anti-trust defense. Once the other elements of an unlawful tie-in have been established, appellant's defense should not be nullified by the manner in which AP keeps its books or the unavailability of cost records upon which a precise computation of separate costs could be made.

We hold that this finding of fact by the district court was based upon an incorrect premise and was "clearly erroneous" as applied to the Ohio Big Cities wire. This holding applies *only* to the Ohio Big Cities wire. We do not hold that the AP "A" and "D" are distinct products separable the one from the other, nor do we hold that the AP "B" wire, which is in use in certain areas other than Cincinnati, is a separate and distinct product. Our holding on the issue of separability is limited solely to the Ohio Big Cities wire; that is, that the Ohio regional wire is separable and distinct from the other three wires involved in the contract between AP and appellant.

█ It is our opinion that the facts hereinabove set forth establish that the Ohio Big Cities wire was a product separate and distinct from the other AP wire services, just as were motion picture films in United States v. Loew's Inc., supra, the television program in American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., supra, and the community television antenna equipment in United States v. Jerrold Electronic Corporation, supra. We further hold that the established practice of AP in requiring appellant to receive and pay for the "A" and "D" wires, plus the Kentucky state wire, as a prerequisite to receiving the Ohio Big Cities wire, constituted a tying arrangement susceptible to violation of Section 1 of the Sherman Act.

A holding that the Ohio Big Cities wire was separable and that offering it with the other three services in a "package" constituted a tying arrangement does not necessarily mean, however, that the arrangement automatically will be declared unlawful. Other essential elements of anti-trust violation also must be established. In Northern Pacific Railway Co. v. United States, supra, 356 U.S. 1, 6, 78 S.Ct. 514, 518, the court said that tying arrangements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. International Salt Co. v. United States, 332 U.S. 392, [68 S.Ct. 12, 92 L.Ed. 20]. Cf. United States v. Paramount Pictures, 334 U.S. 131, 156–159, [68 S.Ct. 915, 92 L. Ed. 1260]; United States v. Griffith Amusement Co., 334 U.S. 100, [68 S.Ct. 941, 92 L.Ed. 1236]."

## 7) *Sufficient Economic Power*

█ We come now to the questions of whether AP had "sufficient economic power" with respect to its wire services to restrain free competition in the market for such services and whether a "not insubstantial" amount of interstate commerce is affected.

On the issue of whether AP possessed "sufficient economic power" with respect to its basic news services within the contemplation of the anti-trust decisions, we first emphasize its position of dominance in the field of news. In 1958 it was the largest single news service in the United States, with approximately 150 news bureaus and offices, and a staff of approximately 3500 staff members and employees in this country and foreign countries. Of the total of approximately 1750 English language daily newspapers in the United States, 69 per cent are AP members. In 1957 and 1958 the membership consisted of approximately 1250 regular members which were owners of newspapers, 275 of which were morning newspapers and 975 of which were afternoon newspapers, and approximately 1700 owners of radio and television stations. There were approximately twelve asso-

ciate members which owned and published newspapers. AP members are located at every newspaper market in the United States. The newspapers of AP members cover at least 90 per cent of the nation's population area.

AP was described by the Supreme Court in Associated Press v. United States, supra, 326 U.S. 1, 18, 65 S.Ct. 1416, 1424, as follows: " 'AP is a vast, intricately reticulated organization, the largest of its kind, gathering news from all over the world, the chief single source of news for the American press, universally agreed to be of great consequence.' "

### a) Uniqueness

The majority opinion of the Supreme Court in Northern Pacific is to the effect that uniqueness alone may establish "sufficient economic power." In Loew's, the Court held in a unanimous opinion that:

> "Market dominance—some power to control price and to exclude competition—is by no means the only test of whether the seller has the requisite economic power. Even absent a showing of market dominance, *the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes*." 371 U.S. at 45, 83 S.Ct. at 102 (Emphasis supplied).

In American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., supra, 221 F. Supp. 848 (S.D.N.Y.), the Court held that the television program there involved "is of a unique nature sufficient to give ABC a leverage to gain economic power over the tying product." ' 221 F. Supp. at 850.

While a patent or copyright is no longer held to be an essential prerequisite to illegal tying arrangements, the monopoly created by a patent or copyright has been emphasized strongly in many opinions, including United States v. Loew's Inc., supra.

The evidence in this case demonstrates that AP asserts property rights in its news dispatches which are comparable to a copyright. In International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, the Supreme Court held that AP has a quasi-property right in the news it gathers and distributes, as against a rival in the same business. The Court compared this interest to a common law copyright in a literary composition and held that it was not abandoned upon first publication.

Since prior to 1929 AP has required each newspaper using its news dispatches to print the following notice:

> "The AP is exclusively entitled to the use for reproduction of all news dispatches credited to it or not otherwise credited in this newspaper and also local news published therein."

An AP official testified that the purpose of this notice is to protect both AP and its members, warning that "anyone who gets a copy of a newspaper is not entitled to lift and sell the news" or reuse it in any way.

We, therefore, conclude that AP news dispatches not only are unique, but they possess a uniqueness "to suggest comparison with a monopoly by patent." Northern Pacific Railway Co. v. United States, supra, 356 U.S. 1, 19, 78 S.Ct. 514, 525 (dissenting opinion).

### b) Desirability of Tied Product

As stated in Loew's, supra, one test of "sufficient economic power" is the desirability of the tied product to purchaser. There can be no doubt of the desirability of AP's news wires to newspapers.

> "Inability to buy news from the largest news agency, or any one of its multitude of members, can have most serious effects on the publication of competitive newspapers, both those presently published and those which but for these restrictions, might be published in the future." Associated Press v. United States, supra, 326 U.S. 1, 13, 65 S.Ct. 1416, 1421.

Appellant found the Ohio Big Cities wire to be so desirable and indispensable

to its requirements that, when AP refused to furnish it except when "tied to" three other wires, appellant continued to subscribe to and pay for all four wires, although it desired only the Ohio regional service and was experiencing a recurring operating deficit.

Both uniqueness and desirability having been established, it follows that "sufficient economic power" will be inferred. United States v. Loew's Inc., supra, 371 U.S. at 45, 83 S.Ct. 97.

### 8) Effect on Interstate Commerce

We come next to the question of whether a " 'not insubstantial' amount of interstate commerce is affected." Northern Pacific Railway Co. v. United States, supra, 356 U.S. 1, 6, 78 S.Ct. 514, 518.

The activities of AP are interstate commerce. Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. AP's contract with appellant was a standard contract, which it required to be executed by all its members. The practice of tying news wire services together has been followed by AP continuously since 1935, when the separate "D" wire was first established. This tying practice has been a requirement that has continued with no variation. The newspaper circulation of members of AP at the 43 principal metropolitan trunk points in the United States comprises 94 per cent of the total circulation of all newspapers in these areas subscribing to news service agencies. They comprise 87 per cent of all subscribing newspapers in these areas. More daily newspapers throughout the nation subscribe to AP than to any other news service. In short AP is the chief source of news for the American press.

While there is no proof in this case as to precise percentages, there can be no doubt that the amount of commerce affected or restrained by the tying practice is substantial. Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 69 S.Ct. 1051; International Salt Co. v. United States, supra, 332 U.S. 392, 68 S.Ct. 12; Osborn v. Sinclair Refining Co.,

supra, 286 F.2d 832 (C.A. 4), cert. denied, 366 U.S. 963, 81 S.Ct. 1924.

 When appellant has established that a tying arrangement exists, coupled with "sufficient economic power to impose an appreciable restraint on free competition in the tied product" affecting a "not insubstantial" amount of interstate commerce, its defense under the Sherman Act does not require affirmative evidence of actual harm to competition or the extent of such harm. Northern Pacific Railway Co. v. United States, supra, 356 U.S. 1, 12, 78 S.Ct. 514; Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 305, 69 S.Ct. 1051.

The impact of the tying arrangement upon competition is illustrated by the fact that if Times-Star had been permitted to drop the AP "D" (financial) wire as requested, it would have subscribed to the UPI financial wire. By adhering to its tying arrangement, AP precluded its competitor, UPI, from selling its financial wire to Times-Star, and prevented Times-Star from subscribing to a competing financial wire which it considered to be more desirable for its purposes.

In International Salt, the Court said: "[I]t is unreasonable, per se, to foreclose competitors from any substantial market" by means of tying arrangements. 332 U.S. at 396, 68 S.Ct. at 15. In Loew's, the Court said:

"Moreover, there can be no question in this case of the adverse effects on free competition resulting from appellants' illegal block booking contracts. Television stations forced by appellants to take unwanted films were denied access to films marketed by other distributors who, in turn, were foreclosed from selling to the stations." 371 U.S. at 48, 49, 83 S.Ct. at 104.

It is a reasonable conclusion under the evidence in this case that "a 'not insubstantial' amount of interstate commerce is affected."

### 9) Illegality of Contract as Defense

 Finally, there is an ancillary proposition which should be discussed.

Here appellant raises the question of the unlawfulness of the contract by way of defense. The Supreme Court has said: "As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court. This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold." Kelly v. Kosuga, 358 U.S. 516, 518, 79 S.Ct. 429, 431, 3 L.Ed.2d 475. This holding is rooted in the principle that a party to an illegal contract cannot subsequently use this illegality to avoid his contractual obligations. The Court went on to note, however, that this view will not apply " * * where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act. * * * " 358 U.S. at 520, 79 S.Ct. at 432.

We do not construe Kelly v. Kosuga, supra, to preclude appellant from asserting Section 1 of the Sherman Act as a defense to the instant action for breach of contract. Appellant has paid for all AP services ever received by it. The Sherman Act is interposed as a defense, not to defeat an obligation for services received, but to avoid paying weekly assessments for two years after appellant had ceased publication of Times-Star and had sold its newspaper. Although a plea of illegality based on the Sherman Act is not favored in actions based on contracts, the statute by its express terms declares contracts in violation thereof to be illegal. 15 U.S.C. § 1. Illegality of the contract under the Sherman Act is a valid defense. Bement & Sons v. National Harrow Co., 186 U.S. 70, 87, 88, 22 S.Ct. 747, 46 L.Ed. 1058.

> "At an early date it was recognized that, despite the absence of a provision in the Sherman Act authorizing a defense of illegality in a private suit on a contract, such a defense might be used; that any one sued upon a contract may set up as a defense that it is a violation of anti-trust laws, and if found to be so, that fact will constitute a good

defense to the action." 6 Toulmin's Anti-Trust Laws, § 18.3 (1951).

Having found a violation of Section 1 of the Sherman Act, this court will not enforce the contract by requiring appellant to pay for two years of service it never received, and thereby enforce " * * * the precise conduct made unlawful by the Act * * * " 358 U.S. at 520, 79 S.Ct. at 432.

### 10) *The Counterclaim*

We affirm the action of the district court in dismissing appellant's counterclaim, since the evidence of damages is too speculative to support the counterclaim. Judgments in anti-trust cases cannot be rendered on speculation or guesswork, even against a party who by his own wrong has precluded a more precise computation of damages. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652; Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392 (C.A. 6), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717.

The judgment of the District Court awarding damages against appellant is reversed and the case is remanded with instructions to dismiss the complaint.

O'SULLIVAN, Circuit Judge (dissenting).

I regret my inability to agree with the learned, exhaustive and painstaking opinion of my brothers. The critical holding of such opinion is that, *as a matter of fact*, the variety of news furnished over AP's Ohio wire constitutes a commodity distinct and separate from the news furnished over its other wire services and that AP must, for a separate price and without purchase of other services, supply the Ohio wire to any member of AP who requests it. This the Associated Press must do under the majority's holding lest it stand convicted of violating Section 1 of the Sherman Act, 15 U.S. C.A. § 1, which provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is declared to be illegal * * *."

Defendant-appellant, Taft-Ingalls Corporation,[1] as a publisher of the Cincinnati Times-Star had been a member of the Associated Press since the latter was formed in 1900. Under its contract in force with the AP at the times here involved, it had agreed as a member of AP to receive, use and pay for at a single price, the news brought to it by the three wires then employed by AP to distribute to its metropolitan city members news "of all kinds" gathered by AP's people domestically and worldwide. It seems fair to assume from the evidence that a metropolitan daily could not operate without receiving from some source all of the news that AP furnished over these three wires. The Cincinnati Times-Star also subscribed to some of the services of United Press International, the other major news gatherer, as did the publisher of the Cincinnati Post and Times-Star after the consolidation. The editor of the Cincinnati Post and Times-Star testified that even if he could have obtained the AP's general news A wire alone, he would not quit receiving the news provided by United Press and that a metropolitan daily could not operate with AP's A wire alone.

Preliminarily, I observe that the activities of the Associated Press, notwithstanding that it is a mutual membership organization, are subject to and can be found to violate the Sherman Act. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Yet I would like to pose at the outset the query whether the present case is properly susceptible to decision in terms of the classic "tying" analysis. The Supreme Court has made it clear that the inherent vice of tying arrangements is that they allow a seller to extend into one sphere a power developed in another sphere, thereby suppressing competition on the merits and taking unfair advantage of an otherwise legitimate market power. E.g., Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In my own mind, the inquiry into product separability is in the present case an awkward approach to the question whether AP has been guilty of wide-scale tying arrangements. A broad view of the record reveals that AP was created by newspapers as a mutual association for the purpose of gathering and disseminating to members as much news as rapidly and as accurately as possible. As it has developed, the costs of the enterprise are not assessed against members on the basis of the actual cost of delivering news to them; rather, each is assessed by a formula which seeks to determine the amount of benefit each member derives from the service rendered. AP's position may be seen as fundamentally the position that it should be allowed to admit only members who are willing to participate in, and bear their fair share of the cost of, this undertaking to provide comprehensive news coverage. I would prefer to deal with this position squarely, applying the rule of reason to the situation as it stands, instead of forcing analysis into the artificial "tying" mould in which the arrangement is per se illegal "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pac. Ry. Co. v. United States, supra, 356 U.S. 6, 78 S.Ct. 518.

Approaching AP's overall setup from general rule of reason analysis, I am persuaded that it is reasonable. There is no evidence whatever that members have been inveigled into undesired commitments by an extension of one form of power into an area where there is no power. Instead, the present record shows only a situation where a rational and fair

---

1. Taft-Ingalls Corporation is the same corporation that published The Cincinnati Times-Star newspaper through a subsidiary, and its previous corporate name was The Cincinnati Times-Star Company. I shall refer to it herein as Times-Star.

system of apportioning the costs of a mutual undertaking would be jeopardized, if not entirely defeated, by requiring the admission of members who do not wish to share in the entire enterprise. Assume for a moment that the Times-Star were admitted solely for the purpose of receiving news of Ohio events under compulsion of the majority's reasoning. Can any fair system be devised to allocate a fair share of AP's total costs to the Times-Star and other possible choosy members? Should AP be coerced into a difficult and arbitrary undertaking by interpreting the Sherman Act to find two or more products are here involved in a tying arrangement? Times-Star's own expert accountant, one Batzer,[2] readily admitted that he was unable to find any way to intelligently allocate to the Ohio Big Cities wire, if taken alone, a proper portion of the total cost of the AP basic news service. This, in my view, supports the trial court's finding of inseparability. To illustrate, may I hypothesize a single newsworthy event. AP's man in Cairo, Egypt gets information that a prominent Cincinnatian is killed in Cairo, together with other Cairo news of worldwide interest; he sends this bundle of news to the AP bureau in New York, and from there it goes to the AP bureau at Columbus on the B wire; the chief there picks off the item of the death of the Cincinnatian and sends it to Cincinnati on the Ohio wire. I pose the question, when does this news become a separate and distinct commodity? At Cairo, Egypt? Or was it converted to singularity at Columbus, Ohio? If so, should a charge for the service be limited to some portion of the salary of the AP man at Columbus and the cost of the electronic channel between Columbus and Cincinnati? But who then is to pay for the services of the people who gathered and sent out the news from Cairo, and who is to pay for its handling in New York and how will these costs be apportioned? How will

Cincinnati be separately assessed for a part of Cairo's costs for the rare day on which an event in Egypt has some special interest in Cincinnati?

Reference has been made to the claimed fact that United Press furnishes one or more wires for separate prices. The evidence on this is quite unclear. The United Press, unlike AP, is a corporation for profit, not a mutual association. The only evidence exhibiting a definite arrangement between a newspaper and United Press was its 1955 contract with Times-Star. This was quite similar to the AP contract and called for delivery of UP's "regular Day Trunk, Ohio State and Sports Report" for an unsegregated charge of "$600 per week during the first four years; $1,000 per week during the fifth year, and $1,300 per week thereafter."

My conclusion that AP's basic arrangement is reasonable in its basic nature can be further supported by attempting to fit the present case into the terms of conventional tying analysis, a task to which I now turn.

### 1) *Separability.*

The tying arrangements first considered to violate the Sherman Act were those where a patentee sought to extend his patent monopoly by refusing to sell the product of his patent without an unpatented item. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). As the law has developed, however, the tying product need not have patent monopoly to condemn its use to control other tied products. Northern Pac. R. Co. v. United States, 356 U.S. 1, 9, 78 S.Ct. 514 (1958). But to establish such illegality, it is essential that the tied and the tying products be *separable* and *different.* "For our purposes a tying arrangement may be defined as an agreement by a party to sell *one product* but only on the condition that the buyer also purchases a *different* (or

2. This witness' firm, Lybrand, Ross Brothers and Montgomery, engaged by Times-Star's counsel, sent ten or more of their people into the home office of AP as part of an attempted cost study in the hope, I assume, that it would be of significant support to Times-Star's case.

tied) product. * * * " Northern Pac. Ry. Co. v. United States, supra, 356 U.S. 5, 78 S.Ct. at 518. (Emphasis supplied.) The defendant-appellant, relying on a charge of illegality to avoid liability for breach of its contract, had the burden of proving such illegality. Palmer v. Chamberlin, 191 F.2d 532 (CA 5, 1951) ; Illinois Surety Co. v. O'Brien, 223 F. 933 (CA 6, 1915). Whether the news items of all kinds that were of especial interest to Ohio readers were different products than the general news items of all kinds which were also of interest to the readers of the Cincinnati Times-Star was a *question of fact*. The District Judge found that defendant-appellant had failed to meet its burden of proving *as a matter of fact* the separability necessary to taint the contract with illegality. Recognizing that such ruling was a finding of fact, my brothers, in reversing the District Judge, conclude as required by Rule 52(a) F.R.C.Proc. that such finding was clearly erroneous. I cannot avoid the conclusion that the District Judge's holding that appellant had failed to prove such essential fact was not only not clearly erroneous, but was in my view clearly correct.

In support of my view, I recite what I believe is a fair summary of the evidence from which the essential facts had to be found. It was from the awareness of its charter members that acquisition and publication of news could better be accomplished through mutual efforts that the Associated Press had its beginnings in 1900. The record does not clearly disclose just what methods and instruments were initially employed to reciprocally exchange news for publication. The morse code was early used and we may assume that telegraph was the customary means. With the developments that followed telegraph, telephone and wireless came into use. The information making up the news is actually conveyed by instrumentalities provided by the American Telephone & Telegraph and the Western Union. The word "wire" came to be used to identify what was referred to in the testimony as an electronic channel, not necessarily a physical wire. It *is clear that the use of the several so-called "wires" did not at all come about as an effort by a manufacturer of several products to increase control of a market by tying one product to another*. To the contrary, the use of several channels came about as the volume of the news increased and it was found inefficient to carry all the news on one channel. With several channels available, each was devoted primarily to one general type of news—top national and international news on A, financial or business news on D, and local interest news on S (Ohio Big Cities in the present case, although we may assume that a similar S wire was provided for other regions as well). Notwithstanding this general classification, the evidence showed that news items outside of the respective classification were, consistent with varying load problems, carried on each of the wires. The reason for this is illustrated by the starting of the D wire about 1934. Up to then the financial and business news was sent over the A wire and a parallel wire called B, but it was found that these facilities were not adequate to expeditiously deliver the financial and business news with the other general news and at the request and with the consent of the AP members, a D wire was established to pick up the financial news separately between 10:00 A.M. and 6:00 P.M. and get it out promptly to the members. During and prior to the times here involved, however, there was no D wire distributing financial and business news to members west of Kansas City. Such news was, and apparently continues to be, carried on the A wire and a so-called B wire, neither of which carry the financial news separately. It was shown also that the use of three wires was limited to the metropolitan dailies and that a condensation of all of the news on the A, B, D and S wires went on a single circuit to smaller city papers that did not need the same volume as the metropolitan papers. The function of the B wire is not entirely clear from the evidence, although it seems to have been a wire parallel to the A wire and

also to have been used for direct exchange of news between the AP members. There was evidence that out of the general news coming into an AP bureau at Columbus on the B wire, the chief of that bureau, on his evaluation, would take out dispatches of special news interest to the Ohio papers and run them on the S or Ohio Big Cities wire. There was much evidence of overlapping on all wires and each at times, according to the general load carried news unrelated to its general classification or news that partook of several classifications.[3] The following footnote recitation in the District Judge's opinion partially covers the evidence.

> "The term 'trunk' as used in this opinion, designates mechanical reproduction of news print. The actual transmission may be carried by wire or by wireless. The news gathered by the Associated Press is transmitted to all members by means of leased wire circuits and electronic facilities. The technical method by which the news is transmitted has no bearing on the legal conclusion herein.
>
> "News originating in the United States is not transmitted to a single control point for transmission, but is transmitted to the members of The Associated Press directly from the news bureau of The Associated Press in the area in which the news originates. News originating abroad is transmitted to the offices of The Associated Press in New York from which it is transmitted to all points in the United States. Newspapers in metropolitan cities require a greater volume of news than newspapers in small cities. The leased wire news service furnished by The Associated Press to newspapers in small cities is transmitted over a single circuit. The leased wire news

service furnished by The Associated Press to newspapers in metropolitan cities is transmitted over multiple circuits. *These multiple circuits, commonly called trunks, have come into existence because, under present technology, it is impossible to transmit all state, national, and international news on one circuit.* As previously mentioned, the leased wire news service furnished by The Associated Press to newspapers in metropolitan cities east of the Mississippi River and north of the Mason-Dixon line is transmitted to such newspapers over circuits designated as A, D, and S trunks. The A circuit operates 24 hours a day and carries news of top national and international importance. The D circuit operates from 10 a. m. to 6 p. m., New York time, Monday through Saturday, and carries financial and business news, market quotations and general news which cannot be accommodated on the A circuit. The S circuit is a regional circuit. In Ohio, the S circuit is known as the Ohio Big Cities wire and carries news of regional interest in Ohio and general news originating elsewhere that cannot be accommodated on the A circuit. The B circuit parallels the A circuit from New York to Kansas City and supplements the A circuit. General news of interest in Ohio is taken from the B circuit at Columbus and relayed to newspapers in Ohio on the S circuit, or Ohio Big Cities wire. At Cincinnati, the B circuit is used exclusively for the transmission of news out of Cincinnati.

> "In the years 1934 and 1935, the volume of news transmitted to afternoon newspapers in metropolitan cities became so great, the A and B circuits were inadequate. The As-

3. The majority opinion quotes from a stipulation describing the news classifications carried over the respective wires. Immediately following the quoted portion, the stipulation provides, "Additional evidence about these circuits and about the AP's leased wire news service to its members will be presented at the trial." The District Judge made his decision from the entire record.

sociated Press sought the views of the members affected as to whether a new facility should be established. With the assent of all members affected, the D wire facility was established. Commencing in 1935, the news which was theretofore transmitted to the Cincinnati Times-Star over the B circuit was transmitted over the D circuit." (Emphasis supplied.)

The evidence offered small help in measuring and separating into identifiable compartments AP's vast total functions of world-wide news gathering and distribution. It impresses me that the intricacies and complexities involved may make it impossible to offer any evidence for reliably dividing into separate and distinct products or articles the incorporeal thing called news. There was no evidence which would permit easy separation into neat divisions of the *gathering* of information of the infinite variety of events that go to make up the news. I agree with my brothers that the fact that the Associated Press did not, and in my view likely could not, allocate to each one of its wire facilities a defined share of its total costs does not by itself foreclose a finding of illegal conduct. However, the obvious difficulty and perhaps impossibility of making any such cost division that would be reliable is, I believe, relevant to and supportive of the District Judge's finding of fact that appellant failed to prove its case of separability and distinctness. To be sure, the District Judge emphasized that appellant had "failed to provide this court with sufficient facts upon which it may be concluded that there is a natural division in the cost of gathering news transmitted over the A, D and State trunks," and further said "without such a complete division, it is unnecessary and futile to explore the other elements of the alleged tying agreement." He also said, however, "Recognition must be made that the compulsory joining of two separate and distinct things is a fundamental prerequisite of an illegal tie sale situation. * * * Defendant has not presented sufficient evidence of separability." I read his whole opinion as a finding that appellant's proofs did not establish as a matter of fact that AP's several wire services—electronic channels—were separate and distinct products.

It seems to me that it would require excessive subtlety and subjective evaluation to break down into various components the tangled skein of human events called news so as to be able to say, as a fact, that information as to certain events separated by time or physical distance or by the degree of interest it excites in one place and not in another, or by the different persons whose conduct make up the newsworthy events, can be divided so as to be identified as distinct and separate products. Is the knowledge of each of the myriad events that make up the news a separate product, or are separate products to be identified by the means chosen for transmission? Much speculation can be indulged in coming to a factual answer to the involved question of separability. I cannot convince myself that news of the death of the governor of Ohio is a different product than news of the death of the governor of Illinois, any more than news of the resignation of the Mayor of Cincinnati is a different product than news of the resignation of the Mayor of Cleveland or of Dayton, Ohio. I do not think that like products can be made unlike by the vehicles chosen for their delivery to the user. The fact that the AP made some broad classifications of its total news so as to deliver it more speedily and efficiently does not in my view immediately convert these classifications into separate and distinct products. Small newspapers received the news of all kinds over one wire. Could one of these newspapers, having a contract to receive such news for a given price and for a fixed period, demand that AP fix a separate price for the society news and being denied, refuse performance of its contract? It seems to me that material to the factual question involved is that all of the members of the AP have at all times agreed to share by way of assessments the cost of getting the

"leased wire news service of The Associated Press." That was the subject matter of appellant's contract with AP and such contract made no breakdown of such service into different kinds of news. There is no showing in the record that prior to appellant's request in 1957, any publisher of any metropolitan newspaper or anyone else ever requested delivery of anything less than what was the "wire news service of the Associated Press" even though, as the system developed, separate electronic channels were employed to deliver two classifications out of the whole for more speedy and efficient delivery. Each metropolitan paper used all of this news and it was testified that all of it was essential to the publishing of such a paper. These circumstances bespeak a recognition of the lack of separability of the news provided by AP and should be weighed upon the factual issue of separability.

I am not convinced that the fact that AP offered to the E. W. Scripps Company to eliminate the so-called Kentucky wire and reduce the total assessment by some $240.00 proves the separability of the A, D and S wires. The record is clear that the latter were always considered as together making up the AP's basic service. It appears that the so-called Kentucky wire was furnished under a separate contract made on the same day as the contract in suit, August 4, 1948, and it was between AP and the Cincinnati Times-Star Company *of Covington, Kentucky.* The contract in suit was between AP and the Cincinnati Times-Star Company *of Cincinnati, Ohio.* The record is unclear as to the reason for this and in any event does not permit us to give significance to the offer made to the Scripps people to furnish the basic service for Cincinnati without any assessment for a Kentucky wire. The proposal to drop this service for the combined paper proves no more in the present context than the undoubted fact that metropolitan newspapers which do not receive the Kentucky wire may be found all over the country. No comparison was offered to show that the operations of the combined paper were such that the Kentucky service should be included in its assessment for whatever reasons made it fair to assess Times-Star but not a New York newspaper for its costs. Thus this incident illustrates only one application of AP's assessment formula, geared to estimated needs and benefits, and leaves the record entirely devoid of any attempt to prove the slightest connection between the proposed reduction and the cost of providing the Kentucky wire.

In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277, 1293 (1953), the Supreme Court said:

"The common core of the adjudicated unlawful tying arrangements is the forced purchase of a *second distinct commodity* with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." (Emphasis supplied.)

In Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, the Court said:

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product *but only on the condition* that the buyer also purchases *a different* (or tied) *product.* \* \* \*" (Emphasis supplied.)

In the cases which have developed the rule declaring tying arrangements illegal under the Sherman and Clayton Act, the tying products usually have had physical and corporeal existence distinct and different from the so-called tied products. E.g., International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Northern Pac. Ry. v. United States, supra. In the block booking cases, the tying products were separate and distinct products, moving pictures, each complete in itself, each "in itself a unique product," having physical being and usable alone without aid or supplementation by any other moving picture films, the tied products. United States v. Loew's, Inc., 371 U.S. 38, 47–48, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

I think it appropriate to emphasize here that this Court is not at liberty to make findings of fact or to draw final inferences of fact simply upon its own evaluation of the evidence. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1959). Conceding that the issue of separability is one of fact, and being aware of this restriction, my brothers find clearly erroneous the District Judge's factfinding. Rule 52(a).

In none of the cases relied upon by the majority has an appellate court set aside as clearly erroneous a District Court's finding of fact. United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97 (1962); Northern Pac. R.R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514 (1958); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed. 2d 806 (1961). In each of these cases it was the District Judge who made the finding of fact—the appellate court sustained such finding. And American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 221 F.Supp. 848 (S.D.N.Y.1963), also relied upon by the majority, involves no evidentiary findings of fact whatever, for the court was concerned only with a motion to dismiss the complaint. I am unaware of any case where an appellate court has found clearly erroneous a finding of fact involving such nuances of meaning and such delicate appraisal and balancing as were involved in determining whether each news "wire" represented a "separate and distinct product."

### 2) *Illegality as defense to breach of contract.*

It should be kept in mind that the contract sued upon did not by its terms or by its negotiation involve any compulsion. Except for possible inferences to be drawn from the recitals in the Minutes of a single AP Board meeting,[4] there is no showing that prior to the Times-Star effort in 1957 either Times-Star or any other AP member actually requested that AP provide anything less than its "leased wire service" which Times-Star contracted to take in its contract of 1948. On the contrary, explanation of the impracticability of separation satisfied any inquiry on the subject.[5] Apparently, no member of AP considered that what it was getting through its contract and membership was made up of distinct products which might be separately desired or used. The whole enterprise was a mutual plan. No reading of the standard AP contract and its by-laws will exhibit an exposed or hidden plan that any separable part of its service was to be provided *on the condition* that some other part be accepted and paid for. There is no hint of "a forced purchase of a second distinct commodity," Times-Picayune Publishing Co. v. United States, supra, or the sale of one product "Only on the condition that the buyer also purchases a different * * * product," Northern Pac. Ry. Co. v. United States, supra. The con-

---

4. "Mr. Cooper advised the Board that four members served on the Pacific Northwest trunk circuit desired to discontinue the wire facilities for the financial tabular service and that three members opposed such discontinuance.

"W. H. Cowles stated that the Spokesman-Review and Spokane Daily Chronicle would consent to discontinuance of the tabular wire, if all members concerned came to an agreement to substitute therefor a reduced stock market report to be carried on the regular Associated Press news wire.

"The Board voted that inasmuch as the tabular service had always been an in-

tegral part of the basic news report, which should not be permitted to disintegrate and inasmuch as assessment reductions had been given for the local element where requested for discontinuance, the present arrangements be continued until the members concerned unanimously agreed otherwise." (Apparently about 1943.)

5. An AP executive testified that " * * * over the years it has been discussed and after an explanation of the impracticability of attempting to deliver a news report on one of several trunk wires, there has not been, to my knowledge, a request for one."

tract sued upon and its negotiation were entirely free of any element of compulsion,[6] and there is nothing in the entire record of this case to suggest that the multiplication of AP's channels for distributing the news reflects "the use of economic power in one market to restrict competition on the merits in another * * *" condemned by the Court in Northern Pacific as "the vice of tying arrangements." 356 U.S. 11, 78 S.Ct. 514 (Emphasis supplied.) Even in September of 1957, Times-Star's first request was not to get the Ohio Big Cities wire for a separate price, but merely to get a reduction in its assessment for receiving the *total* AP service.[7] This, of course, could only be accomplished by discriminating against all members of AP by having them assume part of Times-Star's assessment. Only when this was refused did Times-Star seek to have AP deliver the news coming over the Ohio wire alone. I find it difficult to understand how a contract without taint when made can be converted to complete illegality during its term by a request for total or partial release from its valid obligations. I respectfully assert that while the facts involved were not identical with those in the case at bar the Supreme Court's decision in Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), supports my view in this regard. With its preliminary observation that "As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court," 358 U.S. 518, 79 S.Ct. 431, the Court held that a purchaser who had been receiving the fruits of a contract could not thereafter refuse to fulfill it. In that case Kelly had agreed to purchase 50 cars of onions under a contract which he claimed to have an illegal purpose to

fix and control the price of onions. Kelly accepted delivery of 13 cars but refused to take the balance. The seller sued for damages accruing from Kelly's nonperformance of his unfulfilled promises. It is significant that Kelly *had not received or used* the onions which were the subject of the suit. The Supreme Court affirmed the Seventh Circuit decision which had sustained the action of the District Court in striking the pleaded defense of illegality. Kosuga v. Kelly, 257 F.2d 48 (CA 7, 1958). The Supreme Court said:

"If the defense of illegality is to be allowed as a collateral method of enforcement of the antitrust laws, as the breadth of the petitioner's argument suggests, it must be said that his theory creates a very strange class of private attorneys general." 358 U.S. 520, 79 S.Ct. 431.

I would like further to cite here what the Supreme Court in Kelly v. Kosuga quoted with approval from McMullen v. Hoffman, 174 U.S. 639, 669, 19 S.Ct. 839, 851, 43 L.Ed. 1117, 1129 (1899).

"It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations, and in order the better to secure the public against dishonest transactions."

The action against Kelly was not for the price of onions which he had received and used, but was for damages for failure to take the undelivered portion of the total agreed to be purchased. In the case at bar Times-Star had, under its contract of August 4, 1948, received all of the services covered by the contract up to July of 1958. It had agreed to continue to receive and pay for these services until it terminated its contract by a two-

---

6. Times-Star's position in this regard is emphasized by the following colloquy between the District Judge and Times-Star's counsel:

Court: "* * * there was absolutely no evidence whatever that there was— that it [the contract] was entered into under a complaint."

Counsel: "We don't have to show that, I want that understood, that is basic."

7. As far as this record discloses, a contention that AP's plan of operation was an illegal tying arrangement made its first appearance in Times-Star's pleadings after it was sued for breach of contract.

year notice. The action here is to recover the loss resulting to AP from Times-Star's refusal to receive and pay for their news service during the two years following notice of termination. To enforce such a contract against a willing buyer who freely entered into it without questioning whether a lesser contract could be made seems here, even more than in Kelly v. Kosuga, to be but to enforce "a lawful sale for a fair consideration [which] constitutes an intelligible economic transaction in itself. * * *' 358 U.S. 521, 79 S.Ct. 432.

With respect, I state my belief that the majority have misconstrued a basic issue when they characterize the AP practice as "this AP policy and practice of 'tying' four wire services together in a single 'package' and *requiring* that appellant take and pay for four wire services in order to receive one of them. * * * " There is no evidence that Times-Star even suggested, let alone requested, that it be permitted to take anything different from, or less than, AP's entire basic news service during all the years it continued as a member of AP, much less in 1948 when it entered into the contract sued upon. Even when beset by financial difficulties, the record makes it clear that Times-Star's first thought was to get a reduced assessment for the entire AP basic service, and that reduction of service was sought only after it was made clear no lower assessment could be had. In several places my brothers characterize AP's activities as requiring Times-Star *"to continue to subscribe* and pay for three wires which appellant did not want and need." (Emphasis supplied.) On the contrary, AP merely insisted that Times-Star perform its contract made at a time in 1948 when Times-Star obviously did want and need the AP basic news service. AP did not, in 1957, require Times-Star to "continue to subscribe" for the wires it then decided it would prefer not to take. Times-Star had already subscribed for this service and had received all of the consideration due under its contract. AP merely re-

fused to consent to its breach—no reason appears in the record why Times-Star could not then have given the required two years' notice.

The majority places reliance on United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97 (1962). May I point out that Loew's as well as Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, and United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D. Pa.1960), aff'd per curiam 365 U.S. 567, 81 S.Ct. 755 (1961), also relied on, were cases involving government action to enjoin practices or contracts requiring that a "distinct commodity" be taken *as a condition* to obtaining the more desired "tying" product. Indeed, in United States v. Paramount Pictures, Inc., 334 U.S. 131, 159, 68 S.Ct. 915, 930, 92 L. Ed. 1260, 1293 (1948), the Supreme Court said,

"We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted."

None of these cases involved breach of contract actions and I think that Mr. Justice Brennan's opinion in Kelly v. Kosuga, supra, makes clear the distinction that should be made here. My brothers, asserting that even though voluntarily made, the AP-Times-Star 1948 contract will not save the plaintiff's judgment here, quote from Loew's that "the thrust of the antitrust laws cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by *contractual obligations.* * * * *Contractual obligations* cannot thus supersede statutory imperatives." 371 U.S. 51, 83 S.Ct. at 105. (Emphasis supplied.) The quoted language is misapplied. The "contractual obligations" there being discussed did not at all relate to a contract between a supplier and a purchaser, as AP and Times-Star, but involved instead a supplier's claim that its "contractual obligations" *to a third party* required it

to enter into the tying arrangement under attack by the government.

It impresses me that if there is now a question whether the Associated Press has by its practices become a danger to the free competition sought to be protected by the anti-trust laws, the question would better be resolved by Congressional action or by a frontal attack by the Department of Justice. I find no illegality in the contract before us and thus cannot join in permitting appellant to employ the anti-trust laws to escape obligations voluntarily assumed in a contract which, when made, expressed the bargain it then desired for itself.

I pose the question whether under the majority opinion any member of the Associated Press can legally repudiate its obligations by making and being refused a demand that henceforth it be supplied only, and separately, with the society news, or foreign news, or political news, or news of the British Commonwealth or the European Common Market. If AP's present practices were indeed illegal tying schemes, and in my view they are not, such a rearrangement of the entire Associated Press method of gathering and distributing the news and assessing its costs will be necessary. But I find it difficult to understand why there should be added the chaos of a transition period where none of the present contractual arrangements can be relied upon. If the manufacturer of Chevrolet automobiles had a contract to sell ten of its Chevrolets per month for a stated period to a purchaser, could the purchaser convert the contract into an illegal tying arrangement by demanding that for the balance of the contract term it be allowed to purchase only the steering mechanism for a separate price so as to use the latter in assembled automobiles designed by the purchaser? I doubt it, even though the steering mechanism is manufactured in a separate facility and easily deliverable by itself.

The majority opinion affirms the District Judge's dismissal of appellant's counterclaim for damages under the anti-trust laws because the proofs of damages were too speculative for an award thereof. My above views quite obviously put me in agreement with the majority on the disposition of this issue.

### 3) *Other contract defenses.*

Because of its holding that illegality bars plaintiff's recovery, the majority opinion did not deal with other defenses asserted by appellant. These included claims that under its contract and the by-laws of the Associated Press appellant's liability ceased when it was no longer publisher of the Cincinnati Times-Star and that plaintiff AP had suffered no recoverable damages by appellant's conduct.

a) *Discontinuance of publication.* After the Cincinnati Times-Star assets were transferred to E. W. Scripps Company, owners of the Cincinnati Post, both newspapers were continued as a combined daily called the Cincinnati Post and Times-Star. The AP contract in question provided that it would continue in force "until terminated by the Member upon two years' notice, in writing, by registered mail to the Associated Press of the Member's election to do so." The contract also provided that "The provisions hereof and the By-laws of The Associated Press constitute the whole agreement between the parties hereto." A by-law provided,

"Sec. 13. In case (a) a regular member shall cease to be the owner of the newspaper described in his or its contract with the Corporation, or (b) a newspaper represented by regular membership shall cease regular publication, the membership shall automatically, and without action by the Corporation, become an associate membership."

The quoted by-law does not provide, nor was there any evidence, that becoming an "associate membership" terminated the contract or excused the giving of the two year notice of termination. There was a further provision of the contract that

"Upon the sale or transfer of the business of the Member to which

this agreement relates, the Member shall cause the Member's successor to agree in writing to fulfill the terms and conditions of this agreement during the term hereof and to apply for membership in the Associated Press in the same class as the Member."

The Times-Star did neither of the acts which would have terminated its liability—giving notice or having a successor assume its liability—and clearly breached its contract. It offered evidence, objection to some of which was sustained, to show various instances where the Associated Press had not enforced the two year notice provision against members who had gone out of business. The circumstances of these cases were not shown to have been the same as the transaction whereby the Times-Star paper was sold to Scripps for $3,710,000. But in any event forbearance from enforcing its contract with others did not foreclose AP's insistence on its contract rights against appellant.

b) *Recoverable damages.* Appellant urged that AP failed to prove its damages. It is not disputed that when Times-Star discontinued payment of its weekly assessments such revenue was lost to AP. Appellant offered evidence that during the two year period involved AP obtained new revenue in excess of the total assessments payable by Times-Star during such period by increasing its membership through the additions of radio stations and other media. Such additional revenue, however, did not take the place of the loss accruing from appellant's refusal to pay. The evidence also showed that during the entire period involved AP had a deficit and that notwithstanding revenue from new members it had a net operating deficit in the approximate sum of $600,000. The District Judge spoke on this subject as follows:

"Under the by-laws of Plaintiff, it can recoup losses of revenue from other members in The Association by use of its assessment formula. First, an actual loss is sustained by Plaintiff when a newspaper discontinues its news services without paying its contractual obligations. The Plaintiff corporation, being a non-profit corporation, then finds it necessary to meet its expenses through an increased assessment of the membership. Whatever losses the corporation incurs for any reasons must be assessed to the membership. The members, through the increased, assessment, do not eliminate the loss, they only subsidize the corporation. Thus Plaintiff sustained a real loss when Defendant cancelled the contract."

I consider that the Associated Press' method of obtaining needed revenue by a formula for assessing its members is not unlike a utility's recovery of its costs by spreading rates among the users of its power. In City of Memphis for and on Behalf of Memphis Light, Gas and Water Division v. Ford Motor Co., 304 F.2d 845 (CA 6, 1962) we held that the minimum monthly rate that Ford Motor had agreed to pay for a fixed period was recoverable in full upon Ford's breach of contract, even though the Memphis utility was not required thereafter to generate and deliver the power contracted for by Ford.

I would affirm the judgment of the District Court.